Stephen ABRAMS, Plaintiff,

v.

OCCIDENTAL PETROLEUM CORPORA-
TION, Defendant-Appellant,

and

Kern County Land Company, a Delaware
Corporation, et al., Defendants to
Counterclaims-Appellees.

Isaac MUKAMAL, Plaintiff,

v.

OCCIDENTAL PETROLEUM CORPO-
RATION, Defendant-Appellant,

and

Dwight M. Cochran et al., Defendants to
Counterclaims-Appellees.

KERN COUNTY LAND COMPANY, a
Delaware Corporation, Plaintiff-
Appellee,

and

Stephen Abrams, Plaintiff-Intervenor,

v.

OCCIDENTAL PETROLEUM CORPORA-
TION, a California Corporation,
Defendant-Appellant,

and

Tenneco Inc., a Delaware Corporation,
et al., Defendants to Counterclaims-
Appellees.

COLONIAL REALTY CORPORATION,
Plaintiff,

v.

OCCIDENTAL PETROLEUM CORPO-
RATION, Defendant-Appellant,

and

Kern County Land Company, a Delaware
Corporation, et al., Defendants to Cross-
Claims-Appellees.

Nos. 69–72, Dockets 71–1273 to 71–1276.

United States Court of Appeals,
Second Circuit.

Argued Sept. 21, 1971.

Decided Oct. 13, 1971.

See also D.C., 47 F.R.D. 301.

David R. Hyde, New York City (Cahill, Gordon, Sonnett, Reindel & Ohl, F. Arnold Daum, New York City, of counsel), for appellees Kern County Land Co. and others.

Whitney North Seymour, New York City (Simpson, Thacher & Bartlett, Bernhardt K. Wruble, Paul M. Stein, Kathryn Gabler, New York City, of counsel), and Phillips, Nizer, Benjamin, Krim & Ballon, New York City (Louis Nizer, Paul Martinson, Simon Rose, Neil A. Pollio, New York City, of counsel), for appellant Occidental Petroleum Corp.

Before FRIENDLY, Chief Judge, and MOORE and TIMBERS, Circuit Judges.

FRIENDLY, Chief Judge:

## I.

This appeal by Occidental Petroleum Corporation from a summary judgment of $23,511,337.94, rendered against it in the District Court for the Southern District of New York, raises important questions with respect to the problems under § 16(b) of the Securities Exchange Act that may be encountered by the maker of a tender offer who finds himself outflanked by a "defensive merger," arranged by the target company, which is even more advantageous to the latter's stockholders.

Since the facts are stated in detail in the opinion of the district court, 323 F. Supp. 570 (1971), a summary will suffice:

Kern County Land Company (Old Kern) was a California corporation with 4,328,140 common shares outstanding. Between January 1, 1966 and May 8, 1967, the stock, traded on the New York and Pacific Coast Stock Exchanges, had generally been selling in the 50's and 60's, although it had sold as high as $76.25 per share. It had been paying an annual dividend of $2.60 per share. After unsuccessful efforts to induce the management of Old Kern to discuss a merger, Occidental, on May 8, 1967, announced and on May 9 widely published an offer to purchase shares of Old Kern. The offer, which was to expire June 8, 1967, committed Occidental to purchase all shares properly tendered, on a first-come first-served basis, up to 500,000, at $83.50 per share and to pay an additional $1.50 per share commission for all shares tendered through a broker. Occidental reserved the right to purchase stock tendered in excess of 500,000 shares. On the last trading day before announce-

ment of the offer, Old Kern stock had closed on the New York Stock Exchange at $63.625 per share.

As might have been anticipated, the offer was widely accepted. By May 10 more than 500,000 Old Kern shares had been tendered, so that Occidental had become the beneficial owner of more than 10% of the common stock of Old Kern and thus subject to the requirements of § 16(a) and (b) of the Securities Exchange Act. On May 11 Occidental extended the offer to include an additional 500,000 shares. By May 31 its stock ownership in Old Kern had attained 883,381 shares; by June 8, when the offer expired, the figure had grown to 887,549.[1]

As is frequently the case, Occidental's offer was vigorously resisted by the management of Old Kern. On May 10 it advised stockholders not to accept Occidental's offer, indicating that this might not be the best available since the Old Kern management was then carrying on merger discussions with several other companies. When Occidental extended its tender offer, Old Kern sent telegrams to all stockholders requesting them not to tender.

On May 19 Old Kern's directors announced their acceptance of an offer by Tenneco, Inc., a Delaware corporation, whereby, in exchange for the transfer of Old Kern's assets to a newly organized wholly owned subsidiary (New Kern) of Tenneco Corporation, itself a wholly owned subsidiary of Tenneco, each share of Old Kern would be exchanged for one share of a new $5.50 preference voting stock of Tenneco, convertible into 3.6 shares of common stock.[2] The sale of Old Kern's assets was governed by California corporation law which required approval only of a majority of Old Kern's stockholders and provided no appraisal rights for dissenters. In contrast to Occidental's cash offer, the Tenneco exchange was expected to be free of capital gains tax. In a report to its shareholders on May 19, 1967, the president of Occidental estimated that the value of the new Tenneco preferred was $105 per share. The Old Kern-Tenneco plan, executed on June 14, 1967, provided for a closing at a date to be agreed upon between September 30 and December 31, 1967, or at such other time as the parties might agree.

Occidental responded by initiating two mandamus actions in the California courts, seeking extensive inspection of the books and records of Old Kern including stockholder's lists.[3] Although Old Kern gave some information to Occidental, there is nothing to indicate that this went beyond what was readily available to any stockholder.

While the detailed Tenneco-Old Kern plan was being formulated, Occidental and Tenneco were also in negotiations. These resulted in an option agreement dated June 2, 1967. Reciting that Tenneco Corporation was desirous of obtaining an option to purchase the Tenneco shares that Occidental would receive as a stockholder of Old Kern, it provided that Occidental would grant Tenneco Corporation an assignable option to pur-

---

1. These figures include 1900 shares purchased on the open market on April 24 and April 28, 1967 for which no § 16(b) liability was asserted, by reason of the fact that Occidental did not, by virtue of those purchases, become a more than 10 percent beneficial owner of issued and outstanding stock.

    As a result of the better Tenneco offer described below, only 3,376 Old Kern shares were tendered between May 19, 1967, the date of public announcement of acceptance by Old Kern of Tenneco's offer, and June 8, 1967, the expiration date of Occidental's irrevocable tender offer.

2. Tenneco common had sold during 1967 in the range of 20⅞ to 32½.

3. Under California law any stockholder was entitled to inspect "[t]he share register or duplicate share register, the books of account, and minutes of proceedings of the shareholders and the board of directors and of executive committees of the directors * * *", regardless of the amount of his holdings. Cal.Corp.Code § 3003 (West 1955). However, somewhat different procedures are available to holders of 10% or more. *Id.* § 3005.

chase 886,623 such shares[4] at $105 per share. The option could be exercised at any time after December 9, 1967—six months and one day after Occidental's last contemplated acquisition of Old Kern shares. If the closing under the Old Kern-Tenneco plan occurred before December 10, the option would expire December 31; if the closing were held between December 10, 1967 and July 1, 1968, the option would expire on the thirtieth day after the closing date. For this option Tenneco paid $10 per share, or $8,886,230. If the option was exercised, this sum was to be credited against the purchase price. On the other hand, it was to be returned to Tenneco if the Tenneco-Old Kern plan was not closed by July 31, 1968. Occidental was to receive dividends on the Old Kern or Tenneco preference stock with respect to the last two quarters of 1967;[5] dividends accruing in 1968 would be divided according to the exercise date of the option. At the same time, Tenneco orally assured Occidental that the new Tenneco preference shares would not be listed or registered under the 1934 Act until the option had been exercised or had expired.[6] On the basis of this, Occidental discontinued its actions in the California courts.

Being naturally concerned over the possibility of a huge § 16(b) liability with respect to the Old Kern shares, Occidental sought to have the SEC promulgate a rule exempting it and other tender offerors who found themselves in the same situation. Despite some initial encouragement, the Commission declined to propose such a rule.[7] The Old Kern

4. This figure is 926 shares less than Occidental's ultimate ownership of Old Kern shares. The discrepancy apparently results from uncertainty as to the number of shares tendered, and the continuation of the tender offer, irrevocable by its terms, for an additional six days after signing of the option agreement.

5. The district court found that Occidental would receive third and fourth quarter dividends "outright," regardless of record ownership, 323 F.Supp. at 576, 582-583; appellant argues that this ruling is erroneous and that, in fact, payment of dividends was dependent on record ownership. Our disposition of the case makes it unnecessary to rule on this contention.

6. Occidental's fear was that the acquisition of Tenneco preference shares at the closing of the Kern-Tenneco merger would be characterized for purposes of § 16(b) as a "purchase," and their sale upon exercise of the option as a "sale"; if both occurred within six months, Section 16(b) liability could ensue. By arranging that new Tenneco preferred shares should not be registered until after exercise or expiration of the option, Occidental sought to place the transaction outside the scope of Section 16(b).

   Prior to the Securities Acts Amendments of 1964, Pub.L. 467, 88th Cong. 2d Sess., Act of August 20, 1964, 78 Stat. 565, only securities listed on the national securities exchanges required registration under the 1934 Act. Section 12(g), 15 U.S.C. § 78l(g), added in 1964, extended the coverage of the Act to many over-the-counter securities, but permits a short postponement in registration under that Act. See 1964 U.S.Code Cong. & Adm. News pp. 3014, 3027-3029, 3042. Since trading in the new Tenneco preference shares was initially to be limited to the over-the-counter market, registration could be postponed beyond the exercise or expiration date of the option by virtue of Section 12(g). Hopefully this would avoid § 16(b) liability. See II Loss, Securities Regulation 1038-1039 & n. 7 (2d ed. 1961); V Loss, Securities Regulation 3002 (1969 Supp.). Cf. Heli-Coil Corp. v. Webster, 352 F.2d 156, 160 & n. 6, 166 n. 13 (3 Cir. 1965) (en banc). We are told that the district court dismissed two suits against Occidental for § 16(b) liability with respect to the Tenneco shares precisely for this reason. Goodman v. Tenneco, Inc., 68 Civ. 184 (S.D.N.Y. July 24, 1968); Feinberg v. Tenneco, Inc., 68 Civ. 350 (S.D.N.Y. July 24, 1968). We need not and do not express any opinion on this matter.

7. It is not contended that we should draw any inferences from this, and we do not do so. The Commission may have thought the rule unnecessary or undraftable. Or, as suggested by appellant's counsel, it may have thought the time inappropriate, since the Williams Bill with respect to tender offers, now §§ 13(d) and (e) and 14(d), (e) and (f) of the Securities Exchange Act, was pending before Congress.

stockholders met on July 17. Occidental, in a letter dated July 14 which was read at the meeting, stated it had decided, prior to the June 2 option agreement, not to oppose the sale of assets, since it did not regard the terms as unfair or inequitable. It did not vote its stock, but the necessary majority was readily obtained. On August 4 the Internal Revenue Service issued a ruling that the transaction would constitute a tax-free exchange, provided that Tenneco Corporation rid itself of the option. Application for the necessary permits and authorization was then made to the California Commissioner of Corporations.

The parties are in dispute whether there was a "gentlemen's agreement" that Tenneco and Old Kern would not close before December 9 if Occidental's efforts to secure an exemption were unsuccessful. When it became apparent that they intended to close long before this, a number of injunction suits by Old Kern stockholders, allegedly sponsored by Occidental, began in the state courts of Texas and in federal courts in California and Nebraska. Tenneco and Old and New Kern countered with an action in a Texas court in which they obtained an *ex parte* order restraining the continued prosecution of these suits. Occidental also urged the California Commissioner of Corporations not to approve the transaction on grounds of unfairness to Occidental. He issued the necessary approval on August 30 and the closing was held that day. As part of the closing Old Kern assigned to New Kern all claims and demands accrued or to accrue by virtue of the Securities Exchange Act. Old Kern informed its stockholders that they were irrevocably entitled to the Tenneco preference shares. These were not to be registered under the 1934 Act until December 31 but could be traded over-the-counter in the meanwhile.

To conform to the ruling of the IRS, Tenneco Corp. sold its option to Loeb, Rhoades & Co., a New York investment banking firm, which later assigned this to LR Fixed Investment Trust. On December 11, 1967, Occidental tendered its Old Kern shares for Tenneco preference stock, LR Fixed Investment Trust exercised the option, and Occidental received $95 per share, or $84,229,185, in addition to the $10 per share, or $8,886,230, already in hand.

New Kern moved swiftly to assert liability of Occidental under § 16(b) by bringing an action to that end in the District Court for the Southern District of New York. Three derivative actions for the same purpose were brought by stockholders of Old Kern. The four actions were consolidated and New Kern moved for summary judgment. This was granted.[8] The court dismissed Occidental's affirmative defenses, struck four of its seven counterclaims, and directed that final judgment be entered under F.R. Civ.P. 54(b). This appeal followed. The three derivative actions were dismissed as moot and the plaintiff took no appeal from that ruling.[8a]

Appellees seek to support the judgment on two grounds. They claim first that Occidental "sold" its Old Kern shares when at the August 30 closing it became irrevocably entitled to Tenneco preference stock. They argue in the alternative that the option agreement of June 2, 1967 constituted a sale by Occidental of

---

8. The court assumed the cost of the stock to be $85 per share, a figure not here contested, and computed the sales price at $105 plus an Old Kern dividend of $0.65 per share, or $576,671.85, paid on September 21, 1967 and a Tenneco dividend of $1.375 per share, or $1,217,767.37, paid on January 9, 1968. It also allowed prejudgment interest on all profits received by Occidental. Occidental's challenges to the propriety of these two rulings, see also fn. 5 *supra*, need not be considered in light of our disposition. We similarly find it unnecessary to consider Occidental's claim that any liability should be limited to Old Kern shares acquired by it which were in excess of 10% of the total outstanding.

8a. Occidental's appeals in these actions were from the dismissal of their counterclaims. Our ruling on the merits renders these appeals moot, and they are dismissed as such.

**162**

the Old Kern shares that had been or would thereafter be acquired. We cannot accept either contention.

## II.

It is true enough that, in the case of a garden-variety purchase and sale or sale and purchase within six months, the situations to which Congress' attention was primarily addressed when it enacted § 16(b) of the Securities Exchange Act, the statute operates as a "crude rule of thumb," [9] and that it would be no defense that a person within its terms was operating, by sheer intuition, from Antarctica or even from outer space. See Smolowe v. Delendo Corp., 136 F.2d 231, 235 (2 Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943). The only way to avoid § 16(b) liability in such cases is to see to it that the matching transaction is postponed beyond the six months period, although one day is enough to do the trick.[10] Some decisions of this court reflect, at least in dictum, a belief that this principle should be applied, across the board, even to situations that Congress scarcely considered. The high water mark of this rather simplistic approach was the statement in Park & Tilford, Inc. v. Schulte, 160 F.2d 984, 987 (2 Cir.), cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947), a case of the sale of common stock within six months of an economically compelled conversion of long held preferred into common:

> Defendants did not own the common stock in question before they exercised their option to convert; they did afterward. Therefore they acquired the stock, within the meaning of the Act.

However, that mechanistic view did not long persist even in our own court, see Roberts v. Eaton, 212 F.2d 82 (2 Cir.), cert. denied, 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652 (1954). A revolt against it elsewhere was begun by the opinion of Judge Stewart (as he then was) in Ferraiolo v. Newman, 259 F.2d 342, 346 (6 Cir. 1958), cert. denied, 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629 (1959), which was later followed by the Ninth Circuit in Blau v. Max Factor & Co., 342 F.2d 304 (9 Cir.), cert. denied, 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965). See, contra, Heli-Coil Corp. v. Webster, 352 F.2d 156 (3 Cir. 1965). The problem was given thorough consideration in Blau v. Lamb, 363 F.2d 507 (2 Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967). We there made clear that, in determining whether a conversion constituted a "purchase" and started a new six months period running, we would not apply the approach of the *Park & Tilford* dictum but would look to the question whether the conversion could have lent itself to speculative abuse. We see no reason why this same principle should not apply when the question is whether the receipt of securities of another company, in a transaction which the "insider" did not arrange and in which all stockholders were entitled, indeed here were forced, to participate, constitutes a "sale."

The district court and appellees have pointed to Newmark v. RKO General, Inc., 425 F.2d 348 (2 Cir.), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970), as requiring us to hold that the exchange of Old Kern for Tenneco shares was a sale, for purposes of § 16(b). We disagree. Nothing in the opinion indicates that the courts should apply a different test concerning the possibility of speculative abuse in determining whether an economically forced exchange into the securities of another company constitutes a sale than in deciding whether a conversion into a different security of the same company constitutes a purchase.[11] To the contrary, the opening

---

9. Statement by Thomas G. Corcoran, Esq. in Hearings before Senate Committee on Banking & Currency, 73d Cong., 2d Sess. 6557 (1934).

10. It scarcely needs saying that our reference in this last clause is only to § 16 (b) liability, not to liability for actual use of inside information.

11. The *alternative* basis of Blau v. Lamb, the principle of economic equivalence between the securities being converted and the securities received, is another matter.

section of the *RKO* opinion explicitly adopts Blau v. Lamb, *supra*, as furnishing the proper criterion. The court simply sustained the finding of the district court that the criterion concerning absence of possibility of speculative abuse had not there been satisfied. RKO, owner of 56% of the common stock of Frontier Airlines, had contracted to acquire, subject to certain conditions, at $8.50 per share, 738,251 shares of Central Airlines, representing 49% of Central's outstanding shares, and $500,000 Central debentures convertible into an additional 149,994 shares. It did this, knowing that it was about to propose a merger that would greatly enhance the value of the shares it was acquiring. Furthermore, RKO had certain powers to prevent the merger and avoid liability under its contract of purchase. While the *RKO General* decision does assist appellees to the extent of its holding that an exchange pursuant to a merger *may be* a "sale," the indispensable predicate to the holding that the particular exchange there at issue was within § 16(b) was the finding that RKO's knowledge of the impending merger coupled with the ability to control it involved the possibility of speculative abuse with which § 16(b) meant to deal.

█ Appellees have failed to demonstrate any counterpart of this with respect to Occidental.[12] It is urged that Occidental possessed the "inside information" that Old Kern might well respond by arranging a "defensive merger" and that, if the terms were sufficiently favorable, Occidental would not try to top

them. But, in contrast to *RKO General* where the buyer knew of the imminent announcement of a merger that would enhance the price of the shares and could largely control its course, Occidental had no knowledge what Old Kern would do, and certainly did not know that Old Kern would be able to arrange an exchange offer exceeding Occidental's bid by $20 per share, with the added benefit of freedom from capital gains tax. We fail to see the possibility of speculative abuse in a situation where such an offeror simply declines to make a still higher offer or to attempt to block a transaction[13] which it regards as advantageous to all the stockholders including itself. In so holding, we are glad to find ourselves in accord with law review comments both before and after this court's decision in the *RKO* case. Note, Stock Exchanges Pursuant to Corporate Consolidation: A Section 16(b) "Purchase or Sale"?, 117 U.Pa.L.Rev. 1034, 1056–57 (1969); Comment, Securities Regulations—Exchange of Stock Pursuant to Merger is Sale by Insider under Section 16(b) of the Securities Exchange Act of 1934, 84 Harv.L.Rev. 1012, 1021–22 (1971).

Indeed, if we considered the question here under discussion to be closer than we do, we would be seriously concerned over the policy implications of ruling in appellees' favor. Such a holding would mean that the target of a tender offer not only may solicit a better offer, which is admirable, but also may deliver as bait to the offeree[14] a substantial § 16

---

The *Lamb* court confined its holding on that point to the particular situation there before it, leaving other situations for subsequent decision. See 363 F.2d at 523, and Newmark v. RKO General, Inc., *supra*, 425 F.2d at 354.

12. Obviously Occidental considered Old Kern was undervalued when it offered $83.50 plus a $1.50 commission for a stock that was selling at $63.625; indeed, Occidental must have thought the stock was worth not simply $85 but more, as the Old Kern stockholders surely realized. But there is not a word in the record to suggest that Occidental arrived

at its opinion of the value of Old Kern on the basis of anything that was not public information.

13. While we need not decide whether the result here would differ if Occidental had voted its stock in favor of the merger and this was essential to the required majority, we are not inclined to think this would be significant.

14. It should be noted that the large recovery ordered by the district court enures to the benefit of all stockholders of Tenneco. The stockholders of Old Kern share in this only to the extent of their holdings of Tenneco convertible preferred.

(b) liability on the part of the very offeror whose initiative aroused the target from its seeming torpor and created a large profit for all stockholders, if the parties can force the transaction through within six months from the latter's purchases.[15] The idea that the person who pointed the company down the road to good fortune should be excluded from the profits realized by all other stockholders is repugnant to our sense of equity. Moreover, any such rule would operate to discourage tender offers for more than 10% of a company's stock. If such bids are to have any hope of success, they must be at a figure in excess of current market value. Under appellees' view, while the offeror will be left with the stock he has acquired if he has equalled or topped its true value, he will be deprived of any benefit if he has underestimated the true value and the target corporation can force him into an exchange within six months. This would discourage the making of such offers, which often operate to the great benefit of stockholders of the target corporation, as appears to have been the case here.

### III.

We thus come to appellees' alternative contention, namely, that the option agreement of June 2, 1967, constituted a sale of the Old Kern shares.

■ We begin by recognizing that, under the statutory definition, § 3(a) (14), "sale" includes "contract to sell." We recognize also that an option entitling the optionee to purchase is a contract to sell in a dictionary sense. But the established rule in this circuit has been that the mere grant of an option to purchase is not a sale for purposes of § 16(b); this occurs only when the optionee exercises the option. Silverman v. Landa, 306 F.2d 422 (2 Cir. 1962).

■ It is true that, despite *Silverman*, courts will look through the form of an option to the economic realities. When the down payment is so large in relation to the purchase price that exercise is practically compelled or the price is below any reasonable expectation of the value of the security at the end of the option period, a court might find that in truth and fact a sale had occurred when the "option" was granted. We see no basis for such a finding here, and we do not read the district court's opinion as making one, 323 F.Supp. at 572, 576. There was undisputed testimony that the forfeitable down payment, 10.05%, was a reasonable, non-coercive price, *a fortiori* so in view of the possibility, thin as that might have been, that the option premium might have to be refunded if unforeseen difficulties prevented consummation of the merger. The total price per share was precisely what Lehman Brothers, Occidental's investment adviser, had estimated the Tenneco stock to be worth. It was by no means certain that in the interval between June 2 and December 9, 1971 when the option first became exercisable, the market price of the Tenneco preference shares might not drop well below $95.[16]

Tenneco argues against this that, with a block of such size, market prices would not be determinative, since Tenneco was looking to the long term and did not want Occidental as a large stockholder any more than Occidental wanted to be one. While this is doubtless so, it is likewise true that if the bottom had fallen out of the market, as it has been known to do, so that the Tenneco shares were selling at say 75 at the exercise date, the Tenneco management might have had serious second thoughts—including thoughts of the possibilities of derivative actions for waste—about using more than $84,000,-000 in cash to buy its own stock at a $20 per share premium. We thus see no rea-

---

15. The only way in which the offeror could protect itself would be by limiting its acquisitions to less than 10% of the stock. Nothing in the Williams Act indicates that Congress had any intention of conferring any such further protection on "target" companies.

16. This is *a fortiori* true of the various expiration dates, which might extend as long as July 31, 1968.

son for not accepting the truth of what was said in the Old Kern proxy statement: "Tenneco Corporation has not determined whether it will exercise its option. \* \* \* Depending upon future investment market conditions, Tenneco Corporation may sell the option or the Preference Stock covered by the option; its present intention is not to purchase such Preference Stock as an investment." The mere fact that the option was so designed that Tenneco could not require Occidental to sell the Tenneco preference shares until six months and one day after its last purchase of Old Kern shares, a period obviously chosen with reference to § 16(b), does not place the transaction within that section if it is not otherwise there.

Appellees rely heavily on Bershad v. McDonough, 428 F.2d 693 (7 Cir. 1970), cert. denied, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971), as holding the contrary. That case came before the court of appeals on a finding by the district court that, under the circumstances there presented, the stock had in fact been sold within the six months period, although the option was not formally exercised until later. The district court had relied on a number of circumstances, the most significant being that the optionor gave the optionee an irrevocable proxy to vote the shares and that the optionor and one of his associate directors resigned as directors within a few days after the grant of the option and were replaced by officers of the optionee. In other words, the district court found in effect that the "option" was accompanied by a wink of the eye, and the court of appeals sustained this. Here there is no such finding, and no basis for one. There is thus no conflict between the *Bershad* decision and what we rule here, although we would not be understood as necessarily agreeing with everything said in the court's opinion.

Appellees argue finally that Occidental took advantage of its position to get something for itself that was not available to other Old Kern stockholders and that we should therefore consider this option as a "sale," despite the contrary implications of Silverman v. Landa. We need not disagree with the position that, under the approach of Blau v. Lamb, a court may sometimes find a "purchase" or "sale" in a transaction that would not ordinarily be regarded as one. Although we do not decide the point, appellees' argument might indeed have force if Occidental had acquired a "put," exercisable six months and one day after its last purchase, rather than having submitted itself to a "call." But the two situations are quite different, and we cannot see how Occidental took any unfair advantage of its position here. As indicated, the option price was precisely what Occidental's investment adviser had estimated the value of the Tenneco stock to be a fortnight before. Indeed, the option might have proved disadvantageous to Occidental if the Tenneco stock had boomed or if someone desiring to make a target of Tenneco had come forward with an offer to Occidental. The option seems to us to have been a straight-forward business arrangement between one company that found itself in the undesired position of becoming "locked in" as a large minority stockholder and a second company that was eager to remove the threat this imposed,[17] if economic circumstances permitted.

---

■ We therefore reverse the grant of summary judgment for the plaintiffs. Although defendant did not move for summary judgment, it asks us to instruct the district court to enter one in its favor, as we clearly have power to do. First National Bank v. Maryland Casualty Co., 290 F.2d 246, 251 (2 Cir.), cert. denied, 368 U.S. 939, 82 S.Ct. 381, 7 L.Ed.2d 338 (1961); Local 33, Int'l Hod Carriers v. Mason Tenders, 291 F.2d 496, 505 (2 Cir. 1961); Stein v. Oshinsky, 348 F.2d 999, 1002 (2 Cir.), cert. de-

---

17. The threats were not merely Occidental's owning a large block of Tenneco voting stock but the effect on the market of knowledge that this large holding would be offered for sale.

166

nied, 382 U.S. 957, 86 S.Ct. 435, 15 L.Ed. 2d 361 (1965). Appellees' brief contains nothing to suggest that we should not follow that course if we should determine to reverse, and inquiry at the argument failed to reveal any new facts that might be adduced by them at an evidentiary hearing. While the affidavits are in conflict on some points, notably on the understanding alleged by Occidental that Old Kern and Tenneco would arrange the closing date to protect Occidental against § 16(b) liability, none of these has dispositive significance in the view we take of the case. We therefore grant the relief sought by appellant.

The order granting summary judgment against Occidental is reversed, with instructions to enter judgment dismissing the complaint.