Lawrence A. UZZELL and Robert Lane Arrington, Individually, and upon behalf of all others similarly situated, Plaintiffs,

v.

William C. FRIDAY, Individually, and as President of the University of North Carolina, et al., Defendants,

and

Algenon L. MARBLEY, Chairman of the Black Student Movement and Robert L. Wynn, II, Vice-Chairman of Black Student Movement, Additional Defendants.

No. C–74–178–D.

United States District Court,
M. D. North Carolina,
Durham Division.

Sept. 16, 1975.

Hugh J. Beard, Jr., Charlotte, N. C., for plaintiffs.

Andrew A. Vanore, Jr., Deputy Atty. Gen., Raleigh, N. C., for defendants.

James V. Rowan, James B. Gillespie, Jr., and Karen Bethea Galloway, Durham, N. C., for additional defendants.

## MEMORANDUM OPINION

GORDON, Chief Judge.

This case is before the Court on defendants' motion to dismiss or, alternatively, for summary judgment in an action brought by two students at the University of North Carolina at Chapel Hill challenging certain practices of the University and the Campus Governing Council (CGC) as violations of the Fourteenth Amendment and 42 U.S.C. §§ 1983 and 2000d. While there are twelve causes of action alleged, the plaintiffs in essence challenge three separate practices:

(1) the disbursement of funds collected from mandatory student fees to the Black Student Movement (BSM), a group composed exclusively of black students whose membership policies are allegedly discriminatory and whose purpose is allegedly the promotion of a separate racial and cultural identity;

(2) the provisions for minority representatives on the Campus Governing Council (CGC) authorizing appointment and membership solely upon the basis of race; and

(3) the provision for appointment to the Student Honor Court solely on the basis of race.

The plaintiffs allege this suit to be a class action and seek declaratory and injunctive relief.

The plaintiffs allege that each of the three above practices of the University are violations of 42 U.S.C. § 1983 in that they deny plaintiffs equal protection of the laws, and of 42 U.S.C. § 2000d in that the practices deprive the plaintiffs of full participation in and the equal benefit of the University, a "pro-

gram or activity receiving Federal financial assistance." The defendant University and the BSM, defendant-intervenors, move to dismiss or, in the alternative, for summary judgment, on the grounds that the claim concerning BSM subsidization should be dismissed as moot or for lack of standing; that the claim concerning CGC representation be dismissed for lack of cause and controversy; and that the claim challenging honor court appointment be dismissed for lack of standing.[1] These issues will be resolved on the defendants' summary judgment motions since the Court will consider the many affidavits and answers to interrogatories in the record which are pertinent to the motions before the Court.

The issues before the Court raise questions of substantial difficulty which apparently have not been ruled on by other courts. The defenses of lack of standing and case and controversy make resolution particularly troublesome since they compel consideration of imprecise constitutional doctrines in a case involving claims of a largely unprecedented nature. As a result, this memorandum opinion, sailing an unchartered course, will inevitably pitch and toss in trying to steer between complex constitutional questions and unprecedented applications of § 1983 and § 2000d.

## I.

The Court turns first to the issue of mootness with respect to plaintiff's claim concerning disbursements to the BSM. The BSM is an organization at the University "that recognizes the distinctly different cultural and historical evolution of the Black community vis-a-vis that of the broader society . . ." and whose goals are "to strive for the continued existence of unity among all [BSM] members on this campus; offer outlets for expressing Black ideas and culture; and . . . to insure that . . . [BSM] members on the campus . . . never lose touch with the culture of the Black Community." (Preamble to the Constitution of the Black Student Movement.) From its inception in 1967 until September, 1974, the membership policy of the BSM was limited to black students at the University. On September 18, 1974, the membership policy was amended to allow any student, regardless of race, to be a BSM member if the views of the applicant are consistent with the goals of the BSM as stated in the Preamble. (Art. III, A. Black Student Movement Constitution, Resolution of September 18, 1974.) At present, all the members of the BSM are black.

The defendants contend that the present nondiscriminatory membership policy and the intent of both the BSM officials and University officers, as evidenced by affidavits, ensure a non-exclusive membership policy and, thus, render this claim moot. At the hearing, the attorney for the BSM stated that the new membership policy is truly open and non-exclusive, that no one has ever been turned down for membership and that the purposes and goals of the BSM, while of course focused on the black experience at the University and black culture, are not inconsistent with integrated membership policies. Finally, the defendant University, while conceding that the mere cessation of the challenged illegal activity does not moot the challenge, argues that the University policy of prohibiting disbursement of student funds to a racially exclusive organization is so clear and its commitment to implementa-

---

1. The defendants also move to dismiss all claims for failure to exhaust administrative remedies and to dismiss the class aspect of the case for failure to satisfy Rule 23 requirements. The exhaustion argument cannot be seriously considered in light of *Mc-* *Cray v. Burrell*, 516 F.2d 357 (4th Cir. 1975) certiorari granted *Burrell v. McCray*, —— U.S. ——, 96 S.Ct. 264, 46 L.Ed.2d 249, and the class action argument need not be considered because of the resolution of the other motions.

tion of the policy so unequivocal that the case is moot since there is no possibility of a recurrence of the challenged activity.

The plaintiff contends the controversy is not moot on several grounds, both factual and legal. Firstly, the plaintiff argues that the membership policy is still exclusive since the condition of membership requiring adherence to the preamble and the review of membership applications by a BSM membership committee allow for effective control of non-black membership and potential discrimination. The plaintiff argues that, in light of the past history of exclusive membership, the conditions for membership and the present all black membership amount to de facto exclusivity or raise at least a presumption of discrimination which should allow plaintiff's claim to withstand the mootness defense. Secondly, the plaintiffs assert that even if the BSM membership policies are no longer exclusive, the case should not be judged moot unless it is reasonably clear that the wrongful activity will not recur. In support of their position that there remains a cognizable danger of a recurrent violation, plaintiffs point to the funding of the BSM by student government with the approval of University officials for several years while the organization was racially exclusive. They point out that this funding was done with knowledge of the exclusivity and that the membership policy only changed after institution of this suit. They argue that the cessation of the activity and the declaration of intent not to reinstitute the policy is not sufficient to render this controversy moot.

The first determination on this issue is a factual one. The language of the new constitutional provision regarding BSM membership and particularly the language of the September 18 resolution manifests a clear intent to allow membership in the BSM on a non-discriminatory basis. Moreover, the affidavit of the Chairman of the BSM clearly expresses the membership policy of the BSM to be without regard for race. It is concluded that the BSM has changed its membership policy from black exclusivity and discrimination against whites to a stated policy of open membership subject to the condition of adherence to the Preamble.

Careful consideration of the University and student government policies also discloses a change from a policy which apparently allowed the subsidization of racially discriminatory organizations to one which clearly prohibits such funding. The affidavit of Marcus Williams, the Student Body President, states the policy of Student Government to be that all student organizations must operate under an open membership policy without regard to race and declares the intent to terminate the funding with student fees of any organization violating that policy. This statement of policy is confirmed by the affidavit of the Treasurer of the Student Government and Dean Donald Boulton, the Dean of Student Affairs.

Furthermore, this policy of subsidizing only organizations whose membership is non-exclusive and open is mandated by The Revised North Carolina State Plan for the Further Elimination of Racial Duality in the Public Post-Secondary Education Systems adopted on May 31, 1974, by the Board of Governors of the University of North Carolina (see affidavit of John P. Kennedy, Jr.). These unambiguous promulgations of present University policy with regard to the subsidization of campus organizations and BSM policy as to membership compel the conclusion that the activity challenged by plaintiffs in their first, second, seventh and eighth claims for relief has ceased and that it is the clearly declared intent of the defendants and intervenors that it not be reinstituted.

This brings on for determination a legal question; that is, whether cessation of the challenged activity renders the controversy with respect to this challenged practice moot. While there is some dispute as to the proper standard

for finding mootness when the defendant has discontinued the challenged acts, "the test of mootness is whether the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated." Wright, Miller & Cooper, *Federal Practice and Procedure*, Vol. 13, § 3533 at 282; *United States v. W. T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). As the commentators state, the prediction of possible recurrence of the challenged activity is often difficult and must to some degree depend on "individualized judgment and intuition." Wright, Miller & Cooper, at 282–83. However, in the area of official action, courts have been more receptive to declarations that abandoned illegal policies will not be reinstated particularly when, as in this case, the challenged policy is terminated altogether and not just its application in particular circumstances. Wright, Miller & Cooper, at 283–85, Cf. *Blackwell v. Thomas*, 476 F.2d 443, 445–46 (4th Cir. 1973).

The Court concludes that the clearly stated directives and policies of the University, filed with the Department of Health, Education and Welfare and acquiesced in by the student officials charged with their implementation, to terminate funding to any organization with discriminatory membership policies meets the burden of showing "no reasonable expectation" of recurrence.

The apparent sincerity of all involved and the written promises or policies not to reinstitute the challenged activities along with the visibility of the defendants and their action preclude a serious danger that the challenged practices will be reinstituted. The Court shares plaintiffs' legitimate concern raised by the past subsidization of the BSM when its membership was exclusive. The Court strongly condemns the approving University officials and the student government officials who, with apparent knowledge, for several years disbursed funds collected from mandatory student fees to an organization whose membership policy clearly excluded everyone except black students. However, the membership policy of the BSM has changed and the policy of the University has come full circle to an unequivocal refusal to fund any racially exclusive organization, perhaps as a result of this lawsuit as plaintiffs contend. For this reason, summary judgment is granted for defendants and defendant-intervenor, BSM, on the first, second, seventh and eighth claims for relief on the ground of mootness. The Court hastens to tell the plaintiffs and to admonish the defendants that if the University should intentionally or unintentionally again begin to fund any racially exclusive organization or should the BSM not be truly open to members of all races while it receives state funds,[2] the Court will not be reluctant to entertain this same lawsuit.

## II.

The plaintiffs challenge the minority representation provision of the Student Constitution which requires that there be at least two blacks, two women and two men on the Campus Governing Council (and if this number is not elected, the President of the Student Body must appoint members of such race or sex to comply with the requirement). The defendants seek summary judgment on this claim because of the undisputed fact that the provision has never been utilized since its enactment and, consequently, they argue there exists no case or controversy with respect to this claim.

---

2. A truly open and non-exclusive membership policy requires more than a mere paper promise. The BSM must neither discourage, subtly or discreetly, non-black membership in their organization nor may they use the condition of adherence to the BSM preamble to control non-black membership. There should be a presumption that all who seek membership are eligible to join and should be accepted. Any indication of discrimination by the BSM in its membership policies would be grounds for giving this lawsuit renewed vitality.

■ The defendants' motion is granted for two reasons. The first is the one pressed by them that this provision has never been used and therefore no rights of the plaintiffs have been affected. This renders the claim hypothetical and the impact of any decision would have no direct effect on the status of the litigating parties.

However, there is a more fundamental reason for dismissing the claim for lack of case or controversy. The plaintiffs contend that 42 U.S.C. § 1983 and § 2000d guarantee them a right to attend a state university free from officially imposed or sanctioned discrimination and that a taxpayer or feepayer should not be compelled to subsidize a university which imposes or sanctions discrimination. They argue that these rights were violated at the moment the provision was adopted since, at that point, the defendants began using racial criteria in evaluating representation on the CGC. This argument, it is concluded, does not raise a case or controversy which is appropriate for resolution by this Court.

■ In a strict sense, the claim fails to state a claim or controversy because the effect of this provision is in no way discriminating toward plaintiffs. The provision allows for the appointment of blacks, females *and males* to ensure representation on the CGC and while such a provision may be questioned as a matter of political values or constitutional principle, it cannot, even when implemented, be argued to have an injurious effect on the plaintiffs. *See* Wright, Miller & Cooper, § 3531 at 200. The plaintiffs contend that the existence of the provision imposes a racial criteria in the evaluation of the members of the CGC but the Court is unable to perceive how that translates into a legal interest or cognizable injury to the plaintiffs which can form the basis of a claim raising a case or controversy suitable for adjudication.

On a less technical level, the Court feels summary judgment should be granted on this claim, not necessarily pursuant to any specific judicial doctrine, but because the claim does not warrant judicial review.[3] The Court adopts the following reasoning:

"There is no reason to demand a final expression in terms of standing, ripeness, mootness, or political question doctrine, if the court is able to conclude that there is no sufficient need for deciding the issues tendered without relying on the frequently question-begging terminology of any single concept." Wright, Miller & Cooper, § 3529 at 153.

■ It is the opinion of the Court that the issue raised by this claim is not appropriate for judicial relief and that the denial of judicial relief will cause no hardship to any party. Wright, Miller & Cooper, § 3259 at 141. It is felt that the challenge to the CGC provision is not appropriate for judicial relief because it would involve the Court in a purely policy determination, the resolution of which would have no effect on the status or welfare of the parties involved. The policy of CGC appointment deserves neither judicial approval or condemnation for, as it stands now, it does not affect the rights or interests of any student at the University to a degree which is traditionally susceptible of judicial remedy.

■ Therefore, summary judgment is granted in favor of the defendants on the third, fourth, ninth and tenth claims for relief on the grounds that the claim challenging the CGC appointment provision does not state a claim or controver-

3. The belief that the claim is not justiciable in a broad sense does not indicate concern about the decision to grant summary judgment on the more tangible case and controversy theory. It is felt that both grounds are equally convincing.

sy and is not justiciable. The Court is aware of the fact that the area of justiciability and doctrines such as case and controversy, standing and mootness afford a court substantial discretion to refuse to review a case which it does not wish to entertain. However, the Court firmly believes that the issue raised in the third and fourth claims for relief is precisely the kind of matter for which the justiciability doctrine may be most appropriately invoked.

### III.

The plaintiffs, in their fifth and sixth claims for relief, challenge the provision which allows for the appointment of members of the Student Honor Court on the basis of race. The Student Honor Court is a judicial body entrusted with trial and punishment powers in matters of student discipline. Its members are elected and appointed, but if requested by a defendant before the Honor Court, provision is made for racial or sexual representation which involves the appointment as court judges of four persons (out of a total of seven) of the defendant's race and/or sex.

The defendants contend plaintiffs lack standing to raise this challenge since they cannot demonstrate any injury resulting from these provisions. Adopting the standard set forth in *Association of Data Processing Serv. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), that the interest sought to be protected by the claimant must be within the zone of interests protected by the statute or constitutional provision invoked, the defendants advocate dismissal on the grounds that plaintiffs cannot prove denial of equal protection which is the interest protected by 42 U.S.C. § 1983 and § 2000d.

The plaintiffs assert standing as students, taxpayers to the State, and feepayers to the University, contending they should be allowed to attend a state-supported university free from officially imposed or sanctioned racial discrimination and not be compelled, as taxpayers

and feepayers, to subsidize a racially discriminatory program or activity. Plaintiffs also cite recent United States Supreme Court cases to the effect that a person need have only a little stake in the outcome of the litigation to maintain a suit and that those who are not the direct objects of discrimination nonetheless may have standing to challenge discriminatory practices. *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Trafficante v. Metropolitan Life Ins.,* 409 U.S. 205, 210, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).

While the Court is inclined to agree with the plaintiffs on the standing issue because of the significant relaxation of the standing requirement in *SCRAP* and *Trafficante,* it is concluded that this challenge to the honor court provision should be dismissed for the reasons the claim concerning CGC representation was dismissed in Part II.

■■ Firstly, the claim challenging honor court appointments does not state a case or controversy since the appointment provision does not discriminate against anyone. It may be invoked by all students, black and white, male and female, and while such a provision may be questioned on the grounds of political or social desirability or even judicial impartiality, it does not have the effect of discrimination. In the *Trafficante* case, the plaintiffs were not the objects of the alleged discrimination, but their challenge under the Fair Housing Act to the rental practices of the apartment in which they lived was found to present a case or controversy in that they did allege racial discrimination against others who sought housing in their unit. 409 U.S. at 211–12, 93 S.Ct. 364. The subject case is distinguishable, however, in that the practices challenged here do not discriminate against the plaintiffs or anyone else at the University. Therefore, while the Court would agree that plaintiffs have standing to challenge discriminatory practices imposed or sanctioned by the University, even if these

practices do not directly or seriously affect them, this claim must be dismissed for failure to state a case or controversy.

 Secondly, the Court feels this claim, similar to the challenge to CGC representation, is not justiciable since the issue is not appropriate for judicial review and the denial of review will not impose a hardship on any of the litigating parties. While the claim is a maverick in that it cannot be neatly classified as a political question, advisory litigation or a moot controversy, it does not raise issues for resolution which would have anything more than a very nominal impact on the rights or interests of the litigating parties. Judicial review of this claim would be more akin to an academic exercise than a substantial legal dispute. Therefore, summary judgment is granted in favor of the defendants on the fifth, sixth, eleventh and twelfth claims for relief on the grounds that the claims do not present a case or controversy and are not justiciable.

It is realized that the resolution of the CGC and honor court disputes in this manner, if upheld, effectively precludes the possibility that these practices can ever be ruled upon in a court of law. While the potential scope of 42 U.S.C. § 2000d is still uncertain[4] and the coverage of 42 U.S.C. § 1983 expanding, the Court is of the opinion that the claims raised by the plaintiffs do not state a case or controversy even within the most liberal interpretation of those statutes.

Accordingly, a judgment will be entered.

---

4. It is not clear to what extent Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) will ultimately allow private parties to remedy discrimination or compel desegregation in federally funded activities. Antieau, *Federal Civil Rights Act*, § 138 at 182. An enumeration of practices which would violate 42 U.S.C. § 2000d, set forth by a leading commentator, arguably includes the CGC and honor court provisions challenged here in that they subject individuals to different treatment because of race. Antieau, § 137 at 181–82. However, the practices challenged here neither encourage discrimination nor discourage racial integration in any way and, therefore, do not, it is concluded, state a case or controversy under the most liberal reading of 42 U.S.C. § 2000d. *Cf. Joyner v. Whiting,* 477 F.2d 456 (4th Cir. 1973).