Lawrence A. UZZELL and Robert Lane Arrington, Individually, and upon behalf of all others similarly situated, Appellants,

v.

William C. FRIDAY, Individually, and as President of the University of North Carolina, et al., Appellees.

No. 75–2276.

United States Court of Appeals, Fourth Circuit.

Argued June 10, 1976.

Decided Jan. 5, 1977.

Hugh J. Beard, Jr., Charlotte, N. C., for appellants.

Andrew A. Vanore, Jr., Senior Deputy Atty. Gen., Raleigh, N. C., Karen Bethea Galloway, Durham, N. C. (James V. Rowan, Paul, Rowan & Galloway, Durham, N. C., Rufus L. Edmisten, Atty. Gen. of North Carolina, Raleigh, N. C., on brief), for appellees.

Before BRYAN, Senior Circuit Judge, WIDENER, Circuit Judge, and KUNZIG, Judge, United States Court of Claims.[*]

ALBERT V. BRYAN, Senior Circuit Judge:

In controversy in this appeal is the legality of the following practices at the University of North Carolina: (1) the continuance of an allotment to the Black Student Movement (BSM), a student organization, of a share in the mandatory Student Activities Fees required to be paid the institution on enrollment; (2) limitations based solely upon race on the appointment and membership of minority representatives in the Campus Governing Council; and (3) restrictions based exclusively on race for appointments to the Student Honor Court.

A suit to nullify·these intramural practices was commenced on June 13, 1974 in the District Court by two current students, Lawrence A. Uzzell and Robert Lane Arrington, as a class action, naming as defendants William C. Friday, President of the University, its officers and its Board of Trustees. The Chairman and Vice-President of the BSM were later added as defendants.

These practices were assailed as contravening the Fourteenth Amendment, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Civil Rights Act of 1964, Title VI, 42 U.S.C. § 2000d.[1] As will appear more particularly *infra*, the general offensiveness ascribed to the usages is that they contemplate racial qualifications ·that cause the plaintiffs to suffer disadvantages at the University because they are not of the favored race. As this differentiation derives from the action of a State agency[2]—the University—which admittedly receives Federal financial assistance in the form of grants and contracts, these detriments could constitute deprivations and discriminations condemned in the cited constitutional and statutory safeguards.[3]

Examining each, of the practices in this light, we affirm the District Court's sum-

---

[*] Sitting by designation.

1. "§ 1983. *Civil action for deprivation of rights*

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
"§ 2000d.

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

2. *Arrington v. Taylor*, 380 F.Supp. 1348 (MDNC 1974), *aff'd in unpublished opinion* (4 Cir. August 4, 1975) (No. 74–2080).

3. Jurisdiction is afforded here by 28 U.S.C. §§ 1331 and 1343 as the suit involves a Federal question and civil rights.

mary judgment on defendants' motions as to financial support of the Black Student Movement but reverse the summary judgments as to minority representation on the Council and the Honor Court.[4]

■ With the District Judge we see the plaintiffs as having standing to prosecute each of these claims. See *United States v. SCRAP,* 412 U.S. 669, 686–87, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Moreover, his rejection of the defendants' motion to dismiss for plaintiffs' failure to exhaust State administrative remedies is accepted under the holding of *McCray v. Burrell,* 516 F.2d 357 (4 Cir. 1975), cert. dismissed as improvidently granted, 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976).

### Student Government

The President of the Student Body of the University is the chief executive officer of the student government. Since 1972, its legislative branch has taken the form of a Campus Governing Council (CGC) of 18 members. They are elected annually by and from the student body and each student in good standing, like the plaintiffs, is eligible to vote in the election of its members. The judicial branch includes the Honor Court of the Student Body (SHC).

### I. Black Student Movement

In 1967 a group of students formed the Black Student Movement to promote black culture and identity among black students. The organization was officially recognized by the University and was permitted to use the latter's facilities. It was also assigned office space in the Student Union Building. Since 1969, with the exception of the 1970–71 academic year, the BSM has received yearly appropriations—ranging from $6,400

to $12,000—from funds derived from the Student Activities Fees. The money thus provided has been used to support many programs of the organization, including cultural and entertainment events as well as publication of a newspaper, *Black Ink.*

Upon its inception the BSM adopted a constitution stating that "Any Black student can be a member of the BSM." Similarly, as revised in 1971, it declared that "The members of the Black Student Movement shall be every Black student enrolled in the University of North Carolina at Chapel Hill." Now, through amendment in September 1974, the pertinent article provides that members of the BSM shall include any student whose views are consistent with the goals of the BSM. So, say the defendants, BSM membership is open to all students supporting its aims. Accordingly, the District Court held the plaintiffs' charges to be moot, dismissing them for that reason.

■ The District Judge made fact findings that adequately underprop this holding: aside from the BSM's own curative rescission of the race qualification, the actions and representations of the defendants, including the University, are cited to demonstrate the absolute removal of the exclusivity of black membership. In denying relief, he concluded that the indications and probability for future reinstitution of the discrimination showed apprehension thereof too remote to warrant equitable measures. We are satisfied to affirm on these assurances of the District Judge. *Uzzell v. Friday,* 401 F.Supp. 775, 777–79 (MDNC 1975).[5]

### II. Campus Governing Council

Plaintiffs challenge the Student Constitution's provisions for membership on the

---

4. Our disposition of the case renders superfluous consideration of the appropriateness of the litigation as a class action. See footnotes 5 and 7 *infra.*

5. Since we affirm the decision of the District Judge as to the BSM, we agree with him that consideration of the appropriateness of this aspect of the litigation as a class action is unnecessary. Our holding today is therefore limited to the named plaintiffs and does not affect the

rights of other members of the alleged class. Nevertheless, we concur with the District Judge's admonition of defendants that "if the University should intentionally or unintentionally again begin to fund any racially exclusive organization or should the BSM not be truly open to members of all races while it receives state funds, the Court will not be reluctant to entertain this same law suit." 401 F.Supp. at 779.

Council as violative of their civil rights in that it stipulates that the Council shall include "at least two Councillors of a minority race within the Student Body (if any), two male Councillors and two female Councillors". They further provide that, in the event an annual election does not produce such representation, "the President of the Student Body, with the consent of the Council, shall make the number of appointments necessary to ensure compliance with this section."

The trial court dismissed for lack of the constitutional jurisdictional exaction—that there be an actual case or controversy—in this aspect of the plaintiffs' grievances. 401 F.Supp. at 779–81. First, it was noted that these organizational prescriptions of the CGC had never been activated and that consequently "no rights of the plaintiffs have been affected". Again, the Court on this theme concluded that these features of the CGC were "in no way discriminating toward plaintiffs" for they ensure representation on the CGC to all classes—blacks, women and males. As an overall reason, however, the Court felt " 'there is no sufficient need for deciding the issues . . .' Wright, Miller & Cooper, § 3529 at 153". 401 F.Supp. at 780.

■ We cannot affirm the dismissal, but rather find that plaintiffs stated a justiciable cause of action. We reverse now on the plain and simple ground that, without either reasonable basis or compelling interest, the composition of the Council is formulated on the basis of race. This form of con-stituency blatantly fouls the letter and the spirit of both the Civil Rights Acts and the Fourteenth Amendment. A reading of them, particularly Section 2000d, is all that is needed for authentication of this conclusion. See footnote 1, *supra*. Additionally, see: *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Lige v. Town of Montclair,* 72 N.J. 5, 367 A.2d 833 (1976) (No. A–107); *Bakke v. Regents of the University of California,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152 (1976).

### III. Student Honor Court

■ Since October 2, 1974 an accused has been permitted to request that four of the seven judges on the trial bench of an Honor Court be of his or her race or, in the alternative, of his or her sex.[6]

Plaintiffs' challenge to this article of student government was dismissed by the District Judge upon the same grounds as he struck down the present provisions for CGC composition—lack of case or controversy. 401 F.Supp. at 781–82. For the same reasons as we disagreed there with the District Court's judgment we do so here: the selection of the SHC panel is related to race with no reasonable or compelling nexus to that classification.

### Summary

■ In summary we affirm the decision of the District Court as to the funding of

---

6. The University's Instrument of Student Judicial Governance of 1974 provides, in pertinent part:

"e. Trial Courts

\* \* \* \* \* \*

2) If requested by the defendant, provision shall be made for racial or sexual representation (but not both) on the trial court, as follows:

a) At least four of the seven members of the trial court shall be of the same sex as the defendant;

b) When a defendant is not a member of the majority race, at least four of the seven members of the trial court shall not be of the majority race;

c) When a defendant is a member of the majority race, at least four of the seven members of the trial court shall be of the majority race.

3) Each trial court shall be selected by the Court Administrator under the procedures described below.

\* \* \* \* \* \*

d) If the defendant has requested racial or sexual representation on the trial court, the members of the trial court shall be selected by random drawing from the pool of the entire court panel of a number not to exceed that which will permit the sexual or racial representation requested; and by random drawing from another pool appropriate to insure that representation."

the Black Student Movement but reverse the District Court's grant of summary judgment as to the composition of the Council and the Honor Courts.[7] Although the plaintiffs did not move either this Court or the District Court to grant summary judgment in their favor, we clearly have power to do so. Appellees' briefs contain nothing to suggest that we should not follow that course of action if we determine to reverse and, while the affidavits are in conflict on some points, none of these inconsistencies has dispositive significance in the view we take of the case.[8]

Accordingly, we think it is "just under the circumstances" for this Court to remand with directions that the District Court enter summary judgment for the plaintiffs. *Morgan Guaranty Trust Co. v. Martin,* 466 F.2d 593, 600 (7 Cir. 1972), *quoting* 28 U.S.C. § 2106.

Affirmed in part, reversed in part, and remanded with directions.

---

7. Although we are inclined to the view that the CGC and SHC aspects of this litigation could appropriately go forward as a class action under FRCP 23(a) and (b), *see Potts v. Flax,* 313 F.2d 284, 289 (5 Cir. 1963), it is not necessary to reach the class action issue.

  "By the very nature of the controversy, the attack is on the unconstitutional practice of racial discrimination. Once that is found to exist, the Court must order that it be discontinued. [While the decree] . . . might name the successful plaintiff as the party not to be discriminated against, . . . that decree may not—either expressly or impliedly—affirmatively authorize continued discrimination by reason of race [or sex] against others."

*Id.* (citation omitted). Thus any error in determination of the appropriateness of class action here would be harmless since the decree for all practical purposes would be the same whether entered on behalf of the alleged class or confined to named plaintiffs. *Id.* at 289–90.

8. *Compare Abrams v. Occidental Petroleum Corp.,* 450 F.2d 157, 165–66 (2 Cir. 1971), *aff'd sub nom. Kearn County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) *and Morgan Guaranty Trust Co. v. Martin,* 466 F.2d 593, 599–600 (7 Cir. 1972) *with Fountain v. Filson,* 336 U.S. 681, 69 S.Ct. 754, 93 L.Ed. 971 (1949) *and Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. at 605, 614–17, 93 S.Ct. 1736 (Douglas, J., dissenting); *see* 6 Moore's Federal Practice 56.27[2], 56.12.