**Harry KAHANSKY, Plaintiff,**

v.

**EMERSON RADIO & PHONOGRAPH CORPORATION and Webcor, Inc.,
Defendants.**

**JAMES J. DUANE & COMPANY,
Plaintiff,**

v.

**EMERSON RADIO & PHONOGRAPH CORPORATION and Webcor, Inc.,
Defendants.**

United States District Court
S. D. New York.
May 27, 1960.

Nemerov & Shapiro, New York City, for plaintiff Kahansky.

Martin Horwitz, New York City, for plaintiff James J. Duane & Company (Mortimer A. Shapiro, Martin Horwitz, Aaron Schwartz, New York City, Martin E. Gotkin, New York City, of counsel).

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant Emerson Radio (Simon H. Rifkind, Paul J. Newlon, Joel E. Miller, New York City, of counsel).

RYAN, District Judge.

All parties have moved for summary judgment in these companion suits filed by two stockholders of Webcor, Inc., against Emerson to recover alleged short-swing profits. Section 16(b) (15 U.S. C.A. § 78p(b)).

There are no facts in dispute. The resolution of the motion lies in the an-swer to two questions: (1) was Emerson "an insider" within the statute; (2) if so, was there a purchase and sale by it of Webcor stock at a profit.

By written agreement Emerson contracted to buy from Webcor sufficient stock to become a 20% stockholder in Webcor; thereafter and within two months pursuant to a further agreement Emerson returned to Webcor this very stock and received back the purchase price it had paid, a cash dividend which had been declared and a sum of money representing damages suffered by Emerson. It is the receipt of this sum paid in damages and of the dividend which plaintiffs allege constitutes the illegal profit on a proscribed "sale" by Emerson.

Emerson was not a 10% stockholder in Webcor prior to this dealing. It urges that the acquisition of the Webcor stock by it was at most a "conditional" purchase, which was followed by a complete "rescission" and did not result in a sale. Emerson contends therefore that Section 16(b) does not come into play, and that even if it did, there was no profit. It is plaintiffs' position that there was a simple purchase and sale at a profit of $100,000.

Emerson is a New York corporation with its stock listed on the New York Exchange; Webcor is an Illinois corporation with its stock listed on the Midwest Exchange. Both corporations are engaged in the manufacture and distribution of radios, television sets, phonographs and related products. The events leading up to the transaction may be briefly stated as follows:

Emerson, acting through Abrams, its president, and Webcor, acting through Haffa, its president and controlling stockholder, had early in 1950 been negotiating toward the acquisition by Emerson of a controlling interest in Webcor. These negotiations culminated in an agreement of May 7, 1959 whereunder Haffa and Hunter, another stockholder, and their families as "Sellers" "upon execution of the agreement and subject to the terms and conditions herein set forth" agreed

to sell to Emerson as "Buyer" 130,039 shares of Webcor stock, in negotiable form, to be paid for by certified or cashier's check, "sellers" to pay transfer taxes. The agreement was executed by the sellers on behalf of Webcor and by Abrams on behalf of Emerson.

The agreement provided that by May 15, 1959 the Sellers would cause to be delivered to Buyer the written resignation of at least four of the five Webcor directors, that upon request of Buyer they would call a special meeting of the stockholders for the purpose of electing one or more directors to be specified by Buyer and would cause Webcor to do all necessary to constitute such a meeting valid under Illinois law. The Sellers further agreed to cause such persons as might be named by Buyer as management nominees to be so designated, to solicit proxies on their behalf and to vote Sellers' stock and stock in their control in favor of the election of such nominees. The Buyer in the event that less than $4/5$ of the Board of Directors was constituted of its designees as above provided had "the right but not the obligation" to rescind the purchase of the stock in exchange for a return of the total purchase price in full against delivery of the shares by the Buyer. This right was to be exercised on 15 days' notice and within 60 days following the meeting of stockholders, and repayment by Sellers was to be made within 30 days of notice of rescission. However, it was further provided that whether or not Buyer exercised its right to rescind any and all dividends or distributions to stockholders made between the date of the agreement and the date of repayment and delivery were to be the property of Buyer who was to be under no obligation to pay over the same to Sellers under any circumstances. It was also agreed that Webcor would not make any changes in its organization or business activities unless requested by Emerson; that it would grant Emerson full access to all its properties, books, etc., and give all information relating to its Board meetings and permit Emerson to attend and participate in Webcor's operations.

On behalf of Webcor, extensive warranties as to its financial condition, its contracts, employment agreements, etc., and the usual covenants not to compete were made by Sellers.

Upon execution of the agreement, the stock certificates were delivered to Emerson accompanied by stock powers and documentary stamps and, shortly after, the stock was registered in its name, thus making Emerson a 20% record owner of Webcor. Emerson simultaneously delivered its check for $2,600,780 and paid the transfer tax on the certificates although the agreement otherwise provided. Immediately following this Emerson began to pave the way for acquiring control over Webcor by preparing a proxy statement and proposed notice of special meeting of the stockholders in order to elect three of its nominees as directors and by inviting an executive of another company to join it in managing Webcor's operations. A few days later Abrams was advised by an attorney representing Haffa that the Sellers were unable to secure the resignations of three of the Directors, that in view of this they were unwilling to call a special meeting of the stockholders or to give Emerson access to its books, etc. as provided in the agreement, that several of the warranties and undertakings made by Haffa were in contravention of Illinois law and beyond his power to make and that there were several misstatements and errors in the warranties which had been made. In response, Emerson's attorneys wrote advising Webcor that they would hold Sellers to the agreement, particularly with respect to securing the resignations of the Directors and the election of those chosen by Emerson. Haffa on behalf of Webcor then offered to terminate the entire agreement and return the purchase price to Emerson, which Emerson unconditionally rejected repeating that it would insist on performance and that it would hold Webcor liable for any damage it might sustain from its defaults and demanding payment of the regular quarterly dividend which had been declared on May 5, 1959, and reimbursement of the

transfer taxes it had paid on delivery of the certificates. This letter was followed by a tender from Haffa of the full purchase price in exchange for the stock which Emerson again rejected and formally made demand upon Webcor as a 20% stockholder for permission to examine the books and records of Webcor in order to ascertain the truth of the warranties made by Sellers, to investigate activities of Haffa with Webcor and to obtain a list of the shareholders in order to communicate with them concerning matters of mutual interest to all shareholders of Webcor. Haffa replied that it was holding the purchase price for the account of Emerson and enclosed a letter it had that day sent Webcor advising it that, since the purchase price of the stock had been tendered to Emerson, Haffa and his family were now the owners of the 130,000 odd shares of stock and were entitled to payment of all dividends and distributions. He also requested that a change of such ownership be recorded in the stock transfer books of the corporation. At the same time Webcor wrote to Emerson informing it of Haffa's letter and refusing Emerson permission to inspect the books, etc., because of the questionable status of Emerson as a stockholder of Webcor.

At no time was Emerson given access to the books or properties of Webcor, notified of Board meetings or permitted to participate in any of Webcor's operations.

Emerson then filed a petition for mandamus in the Circuit Court of Illinois, Cook County, to compel Webcor to permit inspection of its books and records and to enforce the statutory penalty for its refusal to comply with Illinois law.

The petition was followed by an exchange of letters and telegrams between Emerson on the one side and Webcor, its counsel, and transfer agent, on the other, in which Emerson objected to statements made by these, derogatory of its status as a stockholder, demanded retractions and reasserted its ownership of the disputed certificates and the continued existence of the May 7 agreement. While the petition

for mandamus was pending, a dividend of $19,505.85 was paid by Webcor to its stockholders, but not to Emerson, whose demand for payment was rejected on the ground that it was not a stockholder of Webcor.

Very soon after the execution of the May 7, 1959 agreement, it became apparent that Webcor had undergone a change of heart and that the former cordial relations established by the agreement were rapidly disintegrating into personal and bitter disputes, with each side delivering threats and ultimata. In the eyes of Emerson the position taken by Webcor that it could unilaterally rescind the sale and its attempt to do so and refusal to further perform was untenable; under the agreement at least, whatever other rights Webcor might have had for disregarding it, Emerson's position was not without merit. It had been explicitly provided by the parties that the right to rescind lay with the Buyer alone at his option.

It was also becoming clear that whatever its ultimate legal victory Emerson's chance of attaining its objective of control over Webcor was fading daily, and so Emerson did what most practical business enterprises do—it decided to terminate the sad affair while it still could salvage something out of it and as it had every right to do under the agreement. On July 14, 1959, an agreement was entered into whereby Emerson redelivered the 130,039 certificates of stock endorsed to Webcor accompanied by a resolution of its Board of Directors in exchange for a total of $100,000—$80,494.15 and a dividend of $19,505.85—a discontinuance of the mandamus proceedings and mutual release from all concerned.

Although the May 7, 1959 agreement recited that the sale of Webcor was subject to the terms and conditions of the agreement, there was an outright sale to Emerson by delivery of negotiable certificates in return for a negotiable check; and a change of ownership recorded on the books of Webcor. Emerson was entitled to receive and retain all dividends and distributions paid on this stock, and

a failure to obtain the fulfillment of all the conditions enumerated in the agreement did not work a cancellation of the sale but merely gave Emerson the right, and not the obligation, to rescind the sale and return the stock but not the dividends. From that time until the subsequent execution and delivery of a release by Emerson, its actions and statements were those of a stockholder and the strength of its legal position lay in the fact that it openly claimed to enjoy such status. Upon transfer of the stock to it, Emerson became the beneficial owner of more than 10% of the stock of Webcor, and if in fact on July 14, 1959 it disposed of this stock at a profit, that profit would inure to the benefit of Webcor. Stella v. Graham Paige, 104 F.Supp. 957; 2 Cir., 1956, 232 F.2d 299; but Cf. Adler v. Klawans, 2 Cir., 1959, 267 F.2d 840 and Arkansas Louisiana Gas v. Stephens Invest., D.C.W.D.Ark.1956, 141 F.Supp. 841.

We find, however, that the transfer of the stock on July 14, 1959, by Emerson to Webcor was not a sale but was in truth a rescission of the May 7, 1959, purchase creating no liability to account for the 100,000 received in settlement of its claims for breach of its written contract.

Unquestionably Emerson had sustained damage and incurred expenses in its efforts to compel Webcor to perform its obligations under the contract, and the settlement agreement so recognized. The sum of eighty thousand odd dollars was specifically allocated to reimbursement of these expenses, including attorneys' fees and interest (on the money Emerson had paid for the stock, the benefit of which Webcor had had for three months). While most of these expenses were at that time unliquidated, Emerson points to the figure of approximately $1,500 paid by it in transfer taxes on delivery of the stock to it for which it had never been reimbursed, $32,000 in legal fees, $15,000 to settle with the executive it had retained to help it operate Webcor, $30,000 which would be interest earned on the purchase price during this time Webcor had the use of it, and $20,000 the interest paid by Emerson on the money it had borrowed to purchase the stock. While it is true that in a Section 16(b) sale of this stock, defendant might not plead these losses as an offset against any profit recoverable under the statute (Adler v. Klawans, supra; Gratz v. Claughton, 2 Cir., 187 F.2d 46, 51), on a rescission and settlement of a claim for a breach of contract, they were certainly items which would be taken into consideration if it was to be placed as near as possible in the position it had formerly occupied. Taken individually and as a whole, these amounts are not so excessive or disproportionate to the value of the claim surrendered by Emerson and the expenses incurred as to cast doubt on their true character. Hennesey v. Fein, D.C.S.D.N.Y., 184 F.Supp. 86.

The payment of the dividend as part of these expenses was completely consistent with a rescission of the purchase, for it had been explicitly provided by the parties that even if Emerson were to exercise its right to rescind its right to receive and retain this dividend was to remain unimpaired. It was then and had been since May 7, 1959, the owner of this amount. In view of this, it was really to Webcor's benefit to be able to apportion this long overdue debt to the amount paid in settlement of Emerson's claim. And even under a Section 16(b) sale, this dividend would not constitute a recoverable profit under the statute for it was not a profit realized from the sale but was part of the purchase price paid initially for the stock, which it is not disputed was substantially above the then market price. Adler v. Klawans, supra.

We conclude that this was a settlement of a bona fide claim and was fair to Webcor and its stockholders; that Emerson derived no unconscionable benefit from it other than reimbursement of expenses justifiably incurred and consideration for its surrender of a valuable claim, that the agreement was reached at arm's length and represented a bona fide compromise of two irreconcilable positions which were about to be litigated, that it effected

a rescission of the purchase of May 7, 1959, and consequently took the entire transaction out of the statute but without operating to frustrate its salutary purpose.

The complaints are dismissed and summary judgment is granted in favor of defendant Emerson; the clerk is directed to enter judgment accordingly.