Richard MORALES, Plaintiff,

v.

GOULD INVESTORS TRUST, Stuart S. Gould, N. Jay Gould and Nathan Kupin, Defendants.

No. 76 Civ. 2927–CSH.

United States District Court, S. D. New York.

Dec. 2, 1977.

David Lopez, New York City, for plaintiff.

Bachner, Tally & Mantell, New York City (Simeon Brinberg, Sol V. Slotnik, New York City, of counsel), for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This is an action brought by an individual shareholder of Gould Investors Trust (the "Trust") on its behalf (although the Trust is a nominal defendant) against three individuals for profits allegedly realized in short-swing sales and purchases in violation of Section 16(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78p(b). The Trust is joined as a defendant because of its failure to bring this action upon plaintiff's demand. There being no dispute as to the facts in this action, both sides have moved for summary judgment pursuant to Rule 56(a) & (b), Fed.R.Civ.P., based on their respective positions as to whether two particular transactions were "purchases" or "sales" within the meaning of the Act. Having determined that the facts as presented are sufficient to determine the legal contentions herein, this Court finds, for the reasons stated in this Opinion, that the plaintiff is entitled to a judgment in the amounts indicated against the individual defendants Stuart S. Gould ("Stuart") and N. Jay Gould ("Jay"). The complaint against the individual Nathan Kupin is hereby dismissed, however, because any profits he might have realized have been paid back to the Trust. Thus plaintiff does not oppose the dismissal. This Court has jurisdiction and proper venue under Section 27 of the Act, 15 U.S.C.A. § 78aa (1971); see *Blau v. Lamb,* 363 F.2d 507, 512 (2d Cir. 1966), *cert. denied,* 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967).

### FACTS

The following represent the relevant facts as stipulated to by all parties to this action.[1]

1. The Trust is a Massachusetts trust whose shares of Beneficial Interest ("Securities") are listed for public trading on the American Stock Exchange in the City of New York, a "National Exchange" within the meaning of Section 16(a) of the Act, and are registered pursuant to Section 12 of the said Act. By reason of such listing and registration, transactions in the Securities of the Trust engaged in by officers, directors or beneficial owners of more than 10% of a class of Gould Securities ("insiders") are subject to the proscriptions and prohibitions of Section 16(b) of the Act.

2. At all times relevant hereto, the defendants were insiders of the Trust as follows:

| Name | Position Held | From | To |
|---|---|---|---|
| Stuart (S. Gould) | Trustee | 7/1/70 | Present |
| | Chairman, Bd. of Trustees | 7/70 | 7/75 |
| | Chairman, Exec. Committee | 2/75 | Present |
| Jay (Gould) | Trustee | 7/70 | 2/75 |
| | Vice President | 7/70 | 2/75 |

3. The position of "Trustee" in the organizational structure of the Trust is substantially equivalent to the position of director in a corporation.

4. On or about April 24, 1974, the defendants agreed in writing to purchase, in a private transaction, the following quantities of Securities of the Trust from third parties:

| Name | Quantity | Cost/Share |
|---|---|---|
| Stuart (S. Gould) | 3923 | $10 |
| Jay (Gould) | 3923 | $10 |

The purchase price was paid through delivery to the Sellers of the personal notes of the respective purchasers.

5. On or about June 7, 1974, Jay requested Stuart to assume the responsibilities of Jay under the purchase agreement of April 24, 1974, to take the number of shares allocated thereunder to Jay and to pay the notes of Jay delivered as consideration for such shares as the notes came due. Stuart, who is the father of Jay, agreed to do so. Such agreement is not evidenced by any writing subscribed by the defendants, but is acknowledged by both of them to have taken place. Jay filed with the Secu-

---

1. It should be understood that any legal conclusions of the parties which appear in the FACTS as concessions by either side are strictly those of the parties and not this Court, except as they may be implicit in the decision of this case.

rities and Exchange Commission a contemporaneous Form 4 reporting the disposition of the said 3923 shares as a "Private Sale" consummated on June 7, 1974 at a price of $10 per share. Stuart filed with the Securities and Exchange Commission a contemporaneous Form 4 reporting the acquisition of the said 3923 shares as a "Private Purchase" consummated on June 7, 1974 at a price of $10 per share.

6. On or about March 12, 1975, prior to the due date of any note delivered as consideration to the sellers, Jay and Stuart agreed that Jay would reassume his obligation to take 1962 shares and his obligation to pay the notes relative thereto when due and that Stuart would be relieved of those obligations.

7. On or about April 1, 1975, prior to the due date of any note delivered as consideration to the sellers, Jay and Stuart agreed that Jay would reassume his obligation to take an additional 1963 shares and his obligation to pay the notes relative thereto when due and that Stuart would be relieved of those obligations.

8. Jay and Stuart filed with the Securities and Exchange Commission contemporaneous Forms 4 reporting the disposition by Stuart as "Private Seller" and the acquisition of Jay as "Private Purchaser" consummated on March 12, 1975 and April 1, 1975 at prices of $10 per share. Thereafter in June of 1976 amendments to the said Forms 4 for the months of March, 1975 and April, 1975 were filed.

9. Defendant Stuart at times relevant to this action, purchased *inter alia,* the following Securities of the Trust:

| Date | Quantity | Cost/Share |
|---|---|---|
| 10/23/74 | 2000 | $4.50 |
| 12/13/74 | 100 | 4.25 |
| 12/20/74 | 500 | 4.00 |
| 12/31/74 | 100 | 3.50 |
| 1/6/75 | 100 | 3.25 |
| 1/9/75 | 1000 | 3.25 |
| 1/20/75 | 100 | 4.25 |
| 5/9/75 | 100 | 4.25 |
| 5/14/75 | 100 | 4.25 |
| 5/23/75 | 100 | 4.25 |
| 6/6/75 | 100 | 4.25 |

| Date | Quantity | Cost/Share |
|---|---|---|
| 6/18/75 | 100 | 4.00 |
| 6/25/75 | 200 | 3.87 |
| 6/27/75 | 100 | 4.00 |
| 7/7/75 | 100 | 4.00 |
| 9/8/75 | 100 | 4.00 |

Defendant Stuart purchased additional Securities of the Trust at times relevant to this action, all such purchases at a cost per share higher than that paid for the above listed Securities. Plaintiff makes no claim of liability with respect to such other transactions.

10. Defendant Jay, at times relevant to this action, purchased the following Securities of the Trust:

| Date | Quantity | Cost/Share |
|---|---|---|
| 7/17/74 | 100 | 6⅞ |
| 9/6/74 | 100 | 6½ |
| 9/27/74 | 700 | 6 |
| 10/15/74 | 300 | 5½ |
| 10/16/74 | 100 | 5½ |

Defendant Jay purchased or acquired interests in additional Securities at times relevant to this action. Plaintiff makes no claim of liability with respect to such other transactions.

11. Plaintiff is a shareholder of the Trust, having become such on April 9, 1976. Plaintiff was not a shareholder of said Trust at the time of the violations complained of.

## DISCUSSION

### I.

Summary judgment is warranted in an action only where the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden such a standard places on the movant is a substantial one. See *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317 (2d Cir. 1975). Nevertheless, the courts have recognized the propriety of such a disposition in Section 16(b) actions where the parties do not contest the facts. See *Newmark v. RKO General, Inc.,* 425 F.2d 348 (2d Cir.), *cert. denied,* 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970); *Lewis v.*

*Realty Equities Corp.,* 373 F.Supp. 829, 831 (S.D.N.Y.1974) (*Lewis I*); but see *Colby v. Klune,* 178 F.2d 872 (2d Cir. 1949). In this action all the material facts are agreed upon by the parties and many of the legal issues beyond dispute, if not expressly conceded. The defendants do not contest the alleged applicability of Section 16(b) on the grounds that they were not "officers" and thus "insiders" within the meaning of the Act. Stuart was a trustee and either chairman of the Executive Committee or chairman of the Board of Trustees at all times from 1970 until the commencement of this action. Jay was both a trustee and Vice President during every transaction for which he faces potential liability. Thus it is clear both defendants were "insiders". See *Ross v. Licht,* 263 F.Supp. 395, 409 (S.D.N.Y.1967).

It is also clear from the statutory language and held valid thereafter in the courts that the Act applies to both purchases following sales and sales following purchases (if within the six-month period). See *Kern County Land Co. v. Occidental Corp.,* 411 U.S. 582, 591, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973); *Morales v. Mapco, Inc.,* 541 F.2d 233, 236 (10th Cir. 1976); *Ohio Drill & Tool Co. v. Johnson,* [1973–1974 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 94,-596 at 96,102 (6th Cir. 1974); *Bershad v. McDonough,* 428 F.2d 693, 696 (7th Cir. 1970), *cert. denied,* 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971); *Sonics International, Inc. v. Johnson,* [1974–1975 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 95,087 at 97,-858 (N.D.Tex.1975).

Plaintiff's action is based on the contention that the arrangement on June 7, 1974 was a "sale" from Jay to Stuart of the subject Securities. Such a finding would render any purchases by Jay within six months of said sale (in this case, those being from July to October 1974) covered by the statute. Plaintiff's claim against Stuart, on the other hand, hinges on the position that the agreements of March 12, 1975 and April 1, 1975 constituted sales by Stuart to Jay, thus subjecting Stuart's purchases between October 23, 1974 and September 8, 1975, to the provisions of the Act. The defendants question only the alleged "sales", not the purchases.

The question of liability thus is reduced, *au fond,* to whether the arrangement between Stuart and Jay on June 7, 1974 and the reciprocal transfers a year later were "sales" for the respective defendants, for Section 16(b) purposes. If so, the profits realized from these purchases made by each within six months, of whichever transactions were "sales" for the particular defendant, are subject to surrender to the Trust.

## II.

■ Section 16(b)[2] provides, *inter alia,* that an "insider" must surrender to the issuer all profits realized "from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months." *Kern*

2. The section reads in its entirety as follows:
"(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period *of less than six months, unless such security* was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit

to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

*County, supra,* 411 U.S. at 591, 93 S.Ct. at 1743. Its purpose is express and succinct:

> "[to] prevent . . . the unfair use of information which may have been obtained by such [insider] by reason of his relationship to the issuery . . .."

The statute also explicitly removes any possible defense based on the insiders' intentions or expectations not to engage in short-swing sales at the time of entering the transactions.

Thus the courts have consistently noted the congressional objective in creating a mechanical "flat rule" which reaches instances not merely with evil actually existing but where even the potential for speculative abuse is found. See *Kern County, supra,* 411 U.S. at 592, 93 S.Ct. 1736. *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 422, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972).[3] Consequently no proof of actual abuse of insider information is required under such a standard, and the result is what Congress saw as a

> "relatively arbitrary rule capable of easy administration [which] imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation." *Reliance Electric Co., supra,* 404 U.S. at 422, 92 S.Ct. at 599, *quoting Bershad, supra,* 428 F.2d at 696.

However, the mechanistic application of the Section does not extend to "unorthodox" transactions, see *Kern County, supra,* 411 U.S. at 594–95, 93 S.Ct. 1736; *Makofsky v. Ultra Dynamics Corp.,* 383 F.Supp. 631, 637 (S.D.N.Y.1974). Thus the question this Court faces, and which many federal courts have grappled with in the past, to wit, whether particular transactions are "purchases" or "sales" within the meaning of the Section, cannot always be resolved by any mechanical test.

> "The complexities of the commercial and financial world . . . have defied

the draftmen's efforts at neat classification. Whether certain 'unorthodox' transactions . . . are 'purchases' or 'sales' for the purposes of section 16(b) cannot be resolved by mere reference to the words of the statute." *Newmark, supra,* 425 F.2d at 351.

It is well settled that in making this determination the purposes of Section 16(b) must be reviewed and the statutory interpretation rendered to effectuate those purposes. *Reliance Electric Co., supra,* 404 U.S. at 424, 92 S.Ct. 596. There is no "automatic rule", *American Standard Inc. v. Crane Co.,* 510 F.2d 1043, 1057 (2d Cir. 1974). Consequently the Supreme Court has given the following directive in instances not clearly within the Section's coverage:

> "In interpreting the terms 'purchase' and 'sale', courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse." *Reliance Electric Co., supra,* 404 U.S. at 424 n. 4, 92 S.Ct. at 600, *Kern County, supra,* 411 U.S. at 595, 93 S.Ct. 1736.

It is the "speculative abuse" standard which this Court may eventually reach in this case, but it is evident that a threshold question of statutory interpretation is presented before a decision such as that made in *Kern County* or *Reliance Electric* can be made. It must be determined initially whether the arrangements of June 1974 and March and April 1975 reflect the requisite qualities of transfer, thus deciding whether they *could* be "sales" within the meaning of the Act. See *Freedman v. Barrow,* 427 F.Supp. 1129, 1151 (S.D.N.Y.1976). If there were a transfer of interest insufficient to constitute a "sale" in either instance, as the defendants contend, then this Court cannot reach the question whether such transfers contained sufficient potential for "speculative abuse" to trigger 16(b) coverage. See *Abrams v. Occidental Petroleum Corp.,* 450 F.2d 157, 163 (2d Cir. 1971),

---

**3.** From this conclusion has emerged the following judicial observation:

> "It might be said that Congress decided in order to throw out the bathwater that the

baby had to go too." *Blau v. Lamb, supra,* 363 F.2d at 515.

*aff'd sub nom. Kern County Land Co. v. Occidental Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).[4] Thus this Court will first address what may be termed the "transfer" issue, and, if the transactions *can* be "sales" within the meaning of the Act, then proceed to the "potential for speculative abuse" test. It must be emphasized, however, that the purposes of Section 16(b) guide both the "transfer" and the "potential for speculative abuse" issues.

### 1. *The Transfers*

It must be noted preliminarily that the familial relationship of the defendants cannot, by itself, provide a ground for avoiding Section 16(b). Nor can defendants benefit from the fact that both are "insiders". See *Morales v. Arlen Realty & Development Corp.,* 352 F.Supp. 941, 944 (S.D.N.Y.1973).

> "The only way to avoid § 16(b) liability . . . is to see to it that the matching transaction is postponed beyond the six months period, although one day is enough to do the trick." *Abrams v. Occidental Petroleum Corp.,* 450 F.2d 157, 162 (2d Cir. 1971), *aff'd sub nom. Kern County, supra,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503.

The defendants cannot contest the fact that arrangements made in June 1974 conveyed to Stuart *all* interest in the securities and at least *some* responsibility for paying the promissory notes Jay had executed earlier. Whatever interest Jay possessed prior to this arrangement's execution was effectively vested in Stuart. The defendants argue, nevertheless, that a) Jay remained liable on the notes, b) that no consideration sufficient to support a contract passed to

Stuart, and c) that the transaction was not a transfer enforceable under the statute of frauds and hence, no exchange occurred sufficient for Section 16(b) application. The same considerations apply to the "reverse" exchanges in March and April 1975. These averments are not persuasive.

The definitions of "purchase" and "sale" under the Act include "any contract to buy, purchase, or otherwise acquire" and "any contract to sell or otherwise dispose of," respectively. Section 3(a) (13) and (14) of the Act; 15 U.S.C.A. § 78c(a)(13) and 14 (1971). It is apparent that in construing the words "purchase" and "sale" Congress intended, and the courts have attempted to effectuate, a liberal interpretation as to what *can* be "purchase" or "sale". See *Kern County, supra,* 411 U.S. at 593–94, 93 S.Ct. 1736; *Morales v. Mapco, Inc., supra,* 541 F.2d 233, 236. Thus, the statute, at least on the "transfer" question, reaches more transactions than what would ordinarily be deemed sales or purchases. *Kern County, supra,* 411 U.S. at 594, 93 S.Ct. 1736. This is in accord with a rule of construction set forth by the then Circuit Judge Potter Stewart, which indicates a liberal application of any "transfer" issue so that the "potential for speculative abuse" question can be reached.

> "Every transaction which can reasonably be defined as a purchase will be so defined, if the transaction is of a kind which can possibly lend itself to the speculation encompassed by § 16(b)." *Ferraiolo v. Newman,* 259 F.2d 342, 345 (6th Cir. 1958), *cert. denied,* 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629 (1959); see *Reliance Electric Co., supra,* 404 U.S. at 432, 92 S.Ct. 596 (Douglas, J., dissenting);

---

**4.** Chief Judge Friendly's opinion in *Abrams* cites the *Newmark v. RKO General* case as establishing "an exchange pursuant to a merger *may* be a 'sale'," 450 F.2d at 163, but that the ultimate decision as to whether it is a "sale" in a particular instance is a function of an analysis under the "possibility of speculative abuse" test. *Id.* Judge Friendly thus acknowledged therein that the *RKO General* decision was determinative of the threshold issue as to whether a particular transaction *could* be a "sale".

Accordingly, this opinion will first discuss the nature of the transactions at issue in terms of whether they *could* be "sales", this being the "Transfer" question. If determined in the affirmative, the discussion must proceed to whether these transactions *were* "sales", this being resolved by the "Potential for Speculative Abuse" question. See *Freedman, supra,* 427 F.Supp. at 1151.

*Champion Home Builders Co. v. Jeffress,* 490 F.2d 611, 615 (6th Cir.), *cert. denied,* 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974).[5]

Thus, as illustrative of the above-noted liberal orientation of the courts, "purchase" or "sale" has been held to include: a) the transfer of securities as payment for a loan, *Lewis v. Adler,* 331 F.Supp. 1258, 1267 (S.D. N.Y.1971); b) the exchange of stock through a merger, *Gold v. Sloan,* 486 F.2d 340, 351–53 (4th Cir. 1973), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974); *Kramer v. Ayer,* [1975–1976 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 95,483 (S.D.N.Y.1976); c) shareholders' transfer agreement with 25% security interest retained, *Garner v. Enright,* [Current Binder] CCH Fed.Sec.L.Rep. ¶ 96,158 (E.D.N.Y. 1977).

In *Garner, supra,* Judge Neaher quoted a Fifth Circuit case, *Dudley v. Southeastern Factor and Finance Corp.,* 446 F.2d 303 (5th Cir.), *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971), as follows:

> "a sale has been made when 'the nature of [the seller's] investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of money for his shares'." *Garner, supra,* ¶ 96,158 at 92,222 *quoting Dudley, supra,* 446 F.2d at 307.

Although both *Garner* and *Dudley* were not Section 16(b) cases, their rationale appears manifestly appropriate to an application in the instant action. In *Dudley* the issue was *when* the transaction constituted a sale, not *whether* it could be a sale. The Fifth Circuit opined that when a shareholder executes an agreement to transfer his shares, even though he retains a security interest, a "sale" has occurred because he no longer has an interest in the issuer, but only a right to the payment of money. This approach clearly dictates a similar finding in the instant case, i. e. that Jay executed a "sale" to Stuart in June 1974 because Jay had surrendered all emoluments of ownership thus transferring any "interest in a going enterprise" in exchange for no longer being primarily liable on the promissory notes. Hence his status as a shareholder was clearly terminated by the agreement. See *Kern County, supra,* 411 U.S. at 604, 607, 93 S.Ct. 1736 (Douglas, J., dissenting). There would not appear to be a sufficient distinction between the consideration received in *Dudley* (a right to payment) and that received by Jay herein (relief from the primary duty to pay) as to warrant finding the former situation a sale and the latter not a sale.[6]

An additional consideration, given attention by the Court in *Kern County,* which supports the conclusion that the transfers in question can be "sales" is whether any "special circumstances indicate that the parties understood and intended that the [transaction] was in fact a sale", 411 U.S. at 604, 93 S.Ct. at 1749. There is at least some evidence that both defendants here acknowledged the transactions were "sales" because they both filed Form 4 pursuant to Section 16(a) of the Act, 15 U.S.C.A. § 78p(a) (1971), and Rules 16a–1 *et seq.* promulgated thereunder, 17 C.F.R. § 240.16a–1 (1977).[7] Form

---

5. "The courts, particularly in our circuit, have consistently interpreted section 16(b) in 'the broadest possible' terms in order not to defeat its avowed objective, resolving all doubts and ambiguities against insiders," *Blau v. Oppenheim,* 250 F.Supp. 881, 884–85 (S.D.N.Y.1966); *Lewis I, supra,* 373 F.Supp. at 832.

6. The Court acknowledges that Jay was still subject to a contingent liability on the promissory notes he had executed. Nevertheless, it cannot be contested that all interest in the Trust Jay possessed by virtue of these 3923 shares was transferred entirely to Stuart in June 1974. Jay's only remaining link to these shares lay in the potential liability on the notes used in the original purchase. Such a tenuous connection is insufficient to justify regarding the June 1974 transfer as not a "sale" within the meaning of the Act.

Thus it is clear to this Court that the transactions in question meet the requirement that "there must be some change in either the character of the investment or the nature of the market risk assumed." *Rothenberg v. United Brands Co.,* [Current Binder] CCH Fed.Sec.L. Rep. ¶ 96,045 at 91,694 (S.D.N.Y.1977).

7. Section 16(a) of the Act reads as follows:

"Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security

4 is entitled "Statement of Changes in Beneficial Ownership of Securities" and is used to report changes in such ownership by insiders. These forms were filed by both defendants for the June 1974 transfer and the March and April 1975 transfers. This Court deems these reports sufficient evidence to indicate the parties understood the transfers were "sales".

The defendants point out, however, that any sales contract for the securities would be unenforceable unless it is in writing under Section 8–319 of the New York Uniform Commercial Code (McKinney 1964).[8] Nevertheless, it would be improvident of this Court to reach the merits of such an assertion in this action, for the construction of the term "sales" under the Act is a matter of federal law. *Bershad, supra,* 428 F.2d at 696. Thus the terms "purchase" and "sale" "should be construed in a manner which will effectuate the purposes of the specific section of the Act in which they are used" even if that contrasts with the meaning given the same terms in another context. *Bershad, supra,* 428 F.2d at 696. The position of the defendants, if adopted, would permit parties to avoid federal securities laws which would otherwise apply merely by foregoing a potential right to enforcement of the contract under state law. The federal courts have not created such avenues of escape, although it has been held that a transaction can be structured in some instances so as to avoid 16(b) liability, see *Rosen v. Drisler,* 421 F.Supp. 1282, 1286 (S.D.N.Y.1976). The applicability of this Section should remain a function of the "factual circumstances of the transaction, the sequence of relevant transactions, and whether the insider is 'purchasing' or 'selling' the security", *Bershad, supra,* 428 F.2d at 697. Thus:

> "[t]he phrase 'any purchase and sale' in Section 16(b) is therefore not to be limited or defined solely in terms of commercial law of sales and notions of contractual rights and duties." *Bershad, supra,* 428 F.2d at 697.

Thus it is clear that insiders who refuse to comply with a state's statute of frauds cannot thereby avoid the application of particular federal securities laws.

For the reasons stated above, it is equally clear that the transactions of March and April 1975 constituted "sales" by Stuart to

(other than an exempted security) which is registered pursuant to section 78l of this title, or who is a director or an officer of the issuer of such security, shall file, at the time of the registration of such security on a national securities exchange or by the effective date of a registration statement filed pursuant to section 78l(g) of this title, or within ten days after he becomes such beneficial owner, director, or officer, a statement with the Commission (and, if such security is registered on a national securities exchange, also with the exchange) of the amount of all equity securities of such issuer of which he is the beneficial owner, and within ten days after the close of each calendar month thereafter, if there has been a change in such ownership during such month, shall file with the Commission (and if such security is registered on a national securities exchange, shall also file with the exchange), a statement indicating his ownership at the close of the calendar month and such changes in his ownership as have occurred during such calendar month."

8. The statute of frauds reads in its entirety:

"A contract for the sale of securities is not enforceable by way of action or defense unless

"(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or

"(b) delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or

"(c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or

"(d) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price." § 8–319 N.Y.U.C.C.

Jay as intended by Congress to be considered within the Act.[9]

Moreover, this Court feels compelled to note that the transactions in question cannot escape the Act's coverage under a rescission theory. It has been held that where both parties mutually agree to rescind a contract for the sale of securities due to incomplete performance there has been no "sale" within Section 16(b)'s meaning. *Kahansky v. Emerson Radio & Phonograph Corp.*, 184 F.Supp. 90 (S.D.N.Y.1960). It is clear that the 1975 arrangements between the defendants were solely the result of Jay's representations in early 1975 to Stuart of the former's financial ability to make the payments on the notes he had executed in April 1974. Jay took half the shares in March and the other half in April of 1975. This was certainly not a mutual rescission of an original agreement together with a payment of damages by the vendor. In *Kahansky* the vendor agreed to pay damages due to his failure to perform. The instant case clearly involves two or three distinct transactions while that case involved merely an aborted sale. See *Makofsky, supra*, 383 F.Supp. at 638.

Moreover, the *Kahansky* decision must be viewed in the light of a more recent decision which held that a mutual rescission of the exercise of options to purchase securities does not escape Section 16(b) liability. *Volk v. Zlotoff*, 285 F.Supp. 650 (S.D.N.Y. 1968). In *Volk* the court relied on the broad construction mandated by the Act for such terms and emphasized the legislative purposes as warranting such a position, 285 F.Supp. at 655.

In addition it has been held that an arrangement which gives the purchaser a right to rescind within two years of the sale is within the Section 16(b) coverage, because there, as in the instant case, the transfer (as contemplated by the parties when they entered the arrangement) was completed and a profit derived therefrom within six months. *Lewis v. Mason*, [1957–1961 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 90,915 (S.D.N.Y.1959).[10]

---

9. A theory which would appear, at first, to be of support to the defendant's position that the questioned transactions cannot be "sales" warrants the address of this Court. It is at least implicitly raised by the defendants in their papers. This theory proposes that because the June 1974 transfer was effectively reversed in March and April of 1975, the status of the parties remained unchanged and hence no 16(b) liability is proper. This argument is not persuasive in this case, however, for at least two reasons. Jay will be used as an example of these reasons in the following discussion.

First, merely because Jay "purchased back" shares he originally sold to Stuart at the same price he had sold them, it does not necessarily follow that after the repurchase Jay was in the same position he would have been had he never sold the shares to Stuart at all. During that year Jay had no interest in those shares and any financing he might be required to arrange to support his promissory notes was not of the same concern to him during that period as it would be had there been no arrangement with Stuart. Thus any benefits Jay could enjoy due to the freedom of control he exercised over his financial affairs for that period certainly distinguishes his status in this case from the hypothetical situation where he never made such sales.

This is not to say, of course, that he might not be in a similar situation, but rather that he is not necessarily in such a status.

Secondly, the purchases-back by Jay were at a time most convenient to both parties, for whatever bases of convenience they deemed salient. It is this freedom to determine the timing of transactions which has been relied upon by the courts as an indication of the evil which Section 16(b) was designed to control. See e. g., *Newmark, supra*, 425 F.2d at 353. This ability cannot only be used to act at the optimum market price of the traded security, but also when it is most beneficial in light of the insider's finances. See *Freedman, supra*, 427 F.Supp. at 1150.

Consequently the rationale proposed in this footnote rejecting the same-position theory, which is really a variant of the "economic equivalence" defense discussed *infra* at note 10, would lose strength in a situation such as in *Kern County* when the transfer was set at a specific date in the future. See 411 U.S. at 603–04, 93 S.Ct. 1736. That is obviously not the case at bar, however, and even assuming the transfer-back were set at a particular time, the financial freedom the insider enjoys during his interregnum would still be a basis for rejecting this theory.

10. It should be noted that the defendants cannot contest the conclusion that the transactions were "sales" by arguing the "economic equivalency" theory as set forth in *Blau v. Lamb, supra*, 363 F.2d at 523; see *Newmark, supra*, 425 F.2d at 354; *Rothenberg, supra*, at 91,693–

In summary, this Court finds that the transfer on June 7, 1974 was a "sale" from Jay to Stuart and that the transfers on March 12, 1975 and April 1, 1975 were "sales" from Stuart to Jay, as so defined in the Act. The Court agrees, however, that the transactions in question are sufficiently "unorthodox" to warrant a "potential for speculative abuse" analysis. The Court makes this conclusion on the basis of several unique facts which include, a) the prices being the same and substantially above the market, b) Jay's residual contingent liability on the notes, c) the almost identical amount being transferred back. See *Kern County, supra,* 411 U.S. at 593, 595, 93 S.Ct. 1736; *Newmark, supra,* 425 F.2d at 351, 353; *Rosen, supra,* 421 F.Supp. at 1286.

### 2. Potential for Speculative Abuse

In *Kern County* the Supreme Court made it clear that in cases involving "unorthodox transactions" the objective test of inclusion/exclusion was no longer appropriate, but rather a "pragmatic" approach was more desirable. *Kern County, supra,* 411 U.S. at 594 and n. 26, 93 S.Ct. 1736. The standard is simply stated: does the type of transaction involved give rise to speculative abuse? *Kern County, supra,* 411 U.S. at 595, 93 S.Ct. 1736; *Newmark, supra,* 425 F.2d at 353; *Rothenberg v. United Brands Co.,* [Current Binder] CCH Fed.Sec.L.Rep. ¶ 96,045 at 91,691 (S.D.N.Y.), *aff'd* (2d Cir. Nov. 28, 1977). The standard is not whether any speculative abuse occurred, but rather whether this type of transaction *might* be the vehicle for such "evil which Congress sought to prevent." *Kern County, supra,*

411 U.S. at 594, 93 S.Ct. at 1744; *Reliance Electric Co., supra,* 404 U.S. at 422, 92 S.Ct. at 599 ("transactions in which the possibility of abuse was believed to be intolerably great"); *American Standard, Inc., supra,* 510 F.2d at 1054; *Abrams, supra,* 450 F.2d at 162–63. Consistent with the purposes of Section 16(b) there clearly can be no justifying its application in instances which pose no danger whatever of insider abuse. *Blau v. Lamb, supra,* 363 F.2d at 519.

In weighing the various considerations which bear on the speculative abuse question, the courts have consistently emphasized two to be of primary importance: 1) access to inside information and 2) the ability to influence the timing of a transaction. See e. g., *Newmark, supra,* 425 F.2d at 353; *Makofsky, supra,* 383 F.Supp. at 640. However, the Supreme Court in *Kern County* has articulated another factor beyond those noted above, which, although perhaps not entitled to weight equal with those two of predominant concern noted above, is considered in this action. Accordingly a discussion of each follows.

### a. Access to Inside Information

In *Kern County* Justice White, in writing for the Court, undertook an analysis of the possible access to inside information manifested by the defendant corporation ("Occidental").[11] The defendant would only become subject to Section 16(b) as an "insider" by virtue of a tender offer it made. The plaintiff alleged that an option which Occidental negotiated prior to the tender offer's expiration to later exchange these

---

94. Having already determined the transfers were separate transactions, it cannot be said that what each defendant surrendered was so similar to that which each received in exchange as to eliminate Section 16(b) coverage. See *Blau, supra,* 363 F.2d at 523.

11. Occidental, allegedly subject to Section 16(b) liability via its ownership of more than 10 percent of the securities of a corporation, made a tender offer for those securities after unsuccessful merger negotiations with the target company. In response the target company executed a "defensive" merger agreement with a third company which would relegate Occiden-

tal to a minority position in the ownership of the surviving company after the tender offer and merger. Occidental, before completion of either the merger or tender offer, arranged an exchange with a subsidiary of the third company—the subsidiary to have an option on Occidental's third-company preference stock in exchange for Occidental receiving the target-company stock. The option could not be exercised until six months after the tender offer expired. 411 U.S. at 584–89, 93 S.Ct. 1736. See discussion in *American Standard, Inc. v. Crane,* 510 F.2d 1043, 1053–57 (2d Cir. 1974).

shares made Occidental liable under Section 16(b). Said option could only be exercised six months after the completion of the tender offer. 411 U.S. at 584–90, 93 S.Ct. 1736. The Court's opinion emphatically rejected the proposition that under these circumstances the defendant had manifested behavior violative of Section 16(b) concluding that whatever the strategy behind the defendant's maneuvers, "they could not have been based on inside information obtained from substantial stockholdings that did not yet exist." 411 U.S. at 597, 93 S.Ct. at 1746. Thus this factor in *Kern County* weighed against the conclusion that the particular transaction lent itself to speculative abuse. See discussion in *Makofsky, supra,* 383 F.Supp. at 640.

On the other hand, in cases where the defendants are corporate officers or directors in the positions like that of the defendants Jay and Stuart, access to inside knowledge is clear. See *Makofsky, supra,* 383 F.Supp. at 640. At all times relevant to this action Jay was a trustee and Vice President while Stuart Chairman of the Board of Trustees or Chairman of the Executive Committee of the Trust. Thus while the possibility of the defendant using inside information was termed "remote" in *Kern County,* 411 U.S. at 598, 93 S.Ct. 1736, it is reasonably certain in this case that "access" was present and such use could occur.

Moreover, it should be mentioned that the actual use of such information is not the target of this Court's inquiry under the access-to-information factor. Rather, only the *possibility* of such use need be shown to constitute some evidence of speculative abuse. See *Kern County, supra,* 411 U.S. at 595, 93 S.Ct. 1736; *Smolowe v. Delendo Corp.,* 136 F.2d 231, 235–36 (2d Cir.), *cert. denied,* 320 U.S. 751, 64 S.Ct. 46, 88 L.Ed. 446 (1943); *Makofsky, supra,* 383 F.Supp. at 638. Due to the defendants' respective positions as insiders as established above, such access is clear.

#### b.  *Ability to Influence Timing*

This consideration has been characterized as essential to a finding that an unorthodox transaction is within Section 16(b)'s coverage. See *Makofsky, supra,* 383 F.Supp. at 640. In *Kern County* the Court suggested the element was absent because after the tender offer and merger were complete, Occidental had no choice but to comply with the terms of the option-exchange. 411 U.S. at 599–600, 93 S.Ct. 1736. By contrast, the ability of the defendant in *Newmark v. RKO General* to "maximize its speculative gain . . . by withholding its expression of satisfaction . . . until the rise in the price" reached its optimum level was regarded with substantial weight in the determination of any potential for speculative abuse. 425 F.2d at 353; see also *Makofsky, supra,* 383 F.Supp. at 640–41.

In the instant case there can be no other conclusion than that both defendants had total control of the timing of all "purchases" and "sales" involving their potential liability. The only stimulus presented to this Court relevant to the timing of the transactions contested by the defendants was the varying ability of Jay to make the payments on certain promissory notes. These were strictly voluntary transfers predicated on reasons sufficient to both parties. Thus the manifest ability of the defendants to dictate the timing of the transfers in question, like the access to information established above, bodes toward a potential for speculative abuse.

#### c.  *Contractual Limits on Speculative Opportunities*

A factor which has not been elevated to the stature of the considerations discussed above, but whose discussion it would be improvident to omit, is the presence of any limitations which the questioned sale places on the speculative opportunities otherwise available. See *Kern County, supra,* 411 U.S. at 603, 93 S.Ct. 1736. In support of the conclusion that there was no potential for speculative abuse, Justice White pointed out that:

> "the date for exercise of the option was over six months in the future, a period that, under the statute itself, is assumed to dissipate whatever trading advantage

might be imputed to a major stockholder with inside information. By enshrining the statutory period into the option, Occidental also, at least if the statutory period is taken to accomplish its intended purpose, limited its speculative possibilities." *Id.* (citations omitted).

Thus if there was only one decision as to the sale or purchase of securities within the six-month period, the speculative possibilities, as proscribed by Section 16(b), are reduced. See *Rothenberg, supra,* at 91,693; see generally, *Kern County, supra,* 411 U.S. at 597–600, 93 S.Ct. 1736. However, in instances such as the instant case, absent any limits on the speculation such as existed in the contract in *Kern County,* the potential for speculative abuse as established by the "access" and "timing" criteria *supra* remains intact.

In summary, it is the conclusion of this Court that the transfers in question were "purchases" and "sales" for the respective defendants within the meaning of Section 16(b). Additionally, because the same sales were "unorthodox", 16(b) liability is predicated on a determination that there was a potential for the type of speculative abuse that Section 16(b) was intended to prevent. It has been shown such a potential existed. Consequently Section 16(b) liability is found and what follows is a determination of the profits realized from the transfers proscribed by the Section and which must be surrendered by the defendants to the Trust.

### III.

In computing damages it is well settled that the Act allows any "sale" to be matched with any purchases within six months.[12] *Gratz v. Claughton,* 187 F.2d 46, 51 (2d Cir.), *cert. denied,* 341 U.S. 920, 71

S.Ct. 741, 95 L.Ed. 1353 (1951). Thus any principle of matching the identical securities or "its corollary, the first-in, first-out rule" is rejected. *Smolowe, supra,* 136 F.2d at 238.

The computation itself involves subtracting the purchase price of the securities from the proceeds of the sales. *Lewis v. Realty Equities Corp.,* 396 F.Supp. 1026, 1029 (S.D. N.Y.1975) (*Lewis II*). The proceeds of the sales in this case are in the form of relief of obligations under promissory notes. This is, nevertheless, no basis for holding that such relief cannot be used to compute "profits realized",[13] see *Lewis I, supra,* 373 F.Supp. at 832–33.

Thus, in determining the amount of proceeds from the "sales" by the respective defendants it is apparent that Jay realized $39,230 from the sale on June 7, 1974. This is the only sale this defendant transacted, for the purposes of this action.

Stuart, on the other hand, made two sales, one on March 12, 1975 of 1,962 shares and the other on April 1, 1975 of 1,963 shares, which total 3,925 (two more than Jay sold Stuart in 1974) and produced sale proceeds to Stuart of $39,250. Of course, the price per share in all these sales was ten dollars.

From these above sums must be subtracted the amounts expended by the respective defendants on purchases of the securities within six months of these sales. These purchases are listed for both Jay and Stuart in the Statement of Facts.[14] For Jay these purchases total $7,732.50 for 1300 shares. Those 1300 shares returned $13,000 when "sold" at ten dollars a share and consequently, subtracting the purchases from the sale returns, the profit realized equals

---

**12.** For a discussion of how the six-month period is calculated, see *Colonial Realty Corp. v. MacWilliams,* 381 F.Supp. 26 (S.D.N.Y.1974).

**13.** It is quite clear that the rule in this Circuit is to give a broad construction to the term "profits realized". See *Newmark, supra,* 425 F.2d at 355 and n. 6.

**14.** The reason the purchase made by Jay on May 24, 1974 of 3923 shares is not included

with the purchases for purposes of computing damages is that by including a portion or all of the May 1974 purchase there would only be a washout situation, because the only sale involved in the computation was at the same price.

The reason such a washout does not eliminate Jay's liability is that *any* sale can be matched with *any* purchase. *Gratz, supra,* 187 F.2d at 51.

$5,267.50. These calculations can perhaps be better understood from the table of these transactions shown in the margin.[15]

For Stuart the sum of the amounts expended in purchases of Securities within six months of March and April 1975 is $15,461.50 for 3925 shares. The corresponding amount from the sales of 3925 shares is $39,250 which equals a profit realized of $23,788.50. These transactions are also set out in the margin.[16]

Thus this Court finds the defendants N. Jay Gould liable in the amount of $5,267.50 and Stuart Gould liable in the amount of $23,788.50 respectively.

█ With regard to the plaintiff's demand for pre-judgment interest, it should be noted that such an assessment is within the discretion of the Court, "given in response to considerations of fairness [but] denied when its exaction would be inequitable." *Board of Commissioners v. United States,* 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939); *Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); see discussion in *Lewis II, supra,* 396 F.Supp. at 1034–35. In another circuit it has been held inequitable to award such interest where the proceedings were lengthy and the violation not wilful. *Gold v. Sloan,* 486 F.2d 340, 353 (4th Cir. 1973), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). That would not appear to be the rule in this Circuit, however, see *Lewis II, supra,* 396 F.Supp. at 1034, and thus this Court must view such a decision to still be within its discretion. Nevertheless, in the absence of any "showing of bad faith or other inequitable conduct by the defendants", *Volk v. Zlotoff,* 318 F.Supp. 864, 867 (S.D.N.Y.1970), and in view of the unique relationships and transactions involved in this case, the plaintiff's request for prejudgment interest is denied.

The foregoing, together with the material in the footnotes, shall constitute the findings of fact and conclusions of law necessary to this decision under Fed.R.Civ.P. 52(a). The parties are accordingly directed to submit the judgment on two (2) days' notice returnable two weeks from the date of this decision.

It is So Ordered.